1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

8

FEDERAL TRADE COMMISSION,

9

Plaintiff,

10

v.

11

IDEAL FINANCIAL SOLUTIONS, INC., *et al.*,

12

13

Defendants.

Case No. 2:13-cv-00143-JAD-GWF

**O R D E R**

14
15

    On August 21, 2013, the Court received the attached hand-written

16

correspondence from Defendant Steven Sunyich. *Ex parte* contact with the Court is not

17

permitted. To the extent any party wishes some action to be taken based upon the

18

contents of the letters, the appropriate motion should be filed.

19

    Dated: August 22, 2013.

20

JENNIFER A. DORSEY
UNITED STATES DISTRICT JUDGE

21
22
23
24
25
26
27
28

August 17, 2013

The Honorable **Judge Jennifer A. Dorsey**
United States District Judge
333 Las Vegas Blvd South, Las Vegas, NV 89101

Re: *Federal Trade Commission v. Ideal Financial Solutions, Inc.*, Case No. 2:13-CV-0143-JAD-FWF

Dear Judge Dorsey:

I'm sure you are very busy with your new appointment, but you have been assigned to our case and I wanted to share some important facts with you.

My family and I have been held hostage since February 1, 2013 by the FTC's unwillingness to release our personal funds. I believe the facts that caused the initial TRO to be put in place and then the PI were largely based on false and inaccurate information that was provided to the Court in an extremely complicated case. This case is so complicated that the FTC failed to even name the person they now call the Kingpin Jared Mosher in their initial compliant. Because our money has not been released we have not been able to hire an attorney.

One day before our initial hearing on February 14, 2013 we were able to get a friend of a friend who was a local attorney named David Koch to stand in for us as we had no idea what to say or do at the hearing. Mr. Koch had no time to prepare but he asked Judge Du the following question, which was recorded in Court transcript:

```
MR. KOCH: I don't know if it's a similar situation,
but with respect to any asset freeze that would be in
place, and that there would be the ability to request from
the receiver reasonable living expenses for some period of
time so that defendants can be able to live, and then get a
new job, and do whatever they need to do and also legal
fees to be requested from those to the receiver.

THE COURT: The order allows for that.
```

Based on Judge Du's statement that "the order allows for that" we have made multiple requests to both the Receiver and the Plaintiff (FTC) to no avail. See Exhibit A, B & C. In summary the Receiver has not even responded to my

request and the FTC has told us not to waste their time asking.  So far the Plaintiff has also been the Judge and Jury on all matters.

In addition the Receiver has been any thing but independent and have provided false and inaccurate information to the Court.  It was interesting that Mr. McNamara went out of his way to provide the false and misleading statements just before Judge Du made her ruling on the Preliminary Injunction as recorded in the Court transcript.

MR. McNAMARA: And have a lot of other things going on. But to the extent you had any additional questions, I just wanted to offer myself to address those. And short of that, the one thing I would note is that these financial statements that Mr. Waller addressed are critically important. We found very little way -- very little in the way of assets in these companies. And I can tell you that it -- I am scratching my head about that. Last year, just out of reserve accounts that had been closed, Mr. Steve Sunyich took in more than $700,000 just in, you know, the reserve account return. That's not the operations of the business. That's the return account. But we are not seeing it in any of the accounts.

The fact is... I NEVER SAW A DIME OF THE $700,000 HE IS REFERRING TOO.  If this were an honest mistake Mr. McNamara should have notified the Judge when he discovered the true facts and corrected his false statement.

The reason the Receiver has found very little "in the way of assets in these companies" is we were not involved in a $25M scam and were just providing basic customer services and product fulfillment as we have been doing for over a decade.

If this were a criminal case the law would allow us due process with a Court appointed attorney.  But because this is a civil case and all of our money has been frozen we are being denied our rights and protection provided in the Constitution of due process.  I have to believe that what the FTC is doing is with these TRO's is unconstitutional and will be stopped.

Exhibit D is a copy of my last email with Megan Gray one of the attorneys with the FTC.  It details just a small portion of the inaccurate information that has been provided to the Court by the FTC.

Exhibits E, F, G, H & I are a few of the affidavits that help explain some of the inaccurate facts that have been provided by the FTC to the Court.

As I state in my email to Ms. Gray we are not attorneys we do not understand the law and we have no way to defend ourselves. Because we are not attorneys we do not know how to file the appropriate motions and documents.

I can provide proof that almost all of the $70,000 that was in my personal bank accounts belonged to my wife and was part of her inheritance she received when her Mother died. All of this can be proven by looking at the tax returns we have provided to both the Receiver and the FTC coupled with our bank records.

We requested to have funds released in our initial corporate answers we filed with the Court but the FTC filed a Motion to have that filing blocked and I'm not sure if Judge Du ever responded to our request. Because we are not attorneys I'm sure we are not filing things correctly, but that is why I'm trying to get my money released. If we can hire an attorney I'm open to trying to settle this case as the FTC is pushing us hard to do so, but I keep telling them I NEED AN ATTORNEY to represent me.

As the Judge in our case I don't know if there is much you can do to help me. I'm going to try to file a Motion to have funds released with the Court for living and legal expenses and I'm sure the FTC is going to try to block it. I'm hoping by knowing some of the facts in this case you might understand my difficult situation and help me get my personal money released.

I'm also going to request a jury trial if we are forced to go to trial. The FTC has told us this is not an option, but I'm hoping that is not the case.

Sincerely,

Steven Sunyich
702-350-1403
stevesunyich@gmail.com

Exhibit A.

Steven Sunyich
7255 W. Sunset Rd. #2104
Las Vegas, NV 89113

July 1, 2013

Ballard Spahr LLP
655 West Broadway
Suite 1600
San Diego, CA 92101-8494

Attn:
Thomas W. McNamara
Andrew W. Robertson

Sent: First Class Mail Return Receipt & by email

Re:  Request for release of money for living expenses and for retaining legal counsel.

Dear Mr. McNamara and Robertson:

In the hearing on February 14, 2013 Mr. David Koch asked Judge Du for the release of
money for legal and living expenses.

MR. KOCH: I don't know if it's a similar situation,
but with respect to any asset freeze that would be in place, and
that there would be the ability to request from the receiver
reasonable living expenses for some period of time so that
defendants can be able to live, and then get a new job, and do
whatever they need to do and also legal fees to be requested from
those to the receiver.

THE COURT: The order allows for that.

As stated in the hearing most of my personal funds that were seized came from an
inheritance my wife received after her Mother died. As is evident now by the financial
records I was not even on Ideal's payroll for months prior to the TRO.

Based on the recent Motion to Intervene filed by Zeal Funding and the fact I have four other
companies named in the complaint who have agreed to provide sign affidavits stating my
none involvement with their company, I have decided I need to hire an attorney to help me
defend myself.

Based on the fact that my legal expenses will far exceed all of my seized funds I hereby
request a full release of all of my personal funds for living and legal expenses.

Sincerely,

Steven Sunyich

Exhibit B

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X *Bernadette Hles*  ☐ Agent ☐ Addressee<br>B. Received by ( Printed Name )  C. Date of Delivery<br>Bernadette Hilgeman<br>D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |
| 1. Article Addressed to:<br><br>Ballard Spahr<br>655 W. Broadway<br>Suite 1600<br>San Diego, CA 92101 | |
| | 3. Service Type<br>☐ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7012 1640 0001 1029 0578 |
| PS Form 3811, February 2004 | Domestic Return Receipt  102595-02-M-1540 |

Steven Sunyich
7255 W. Sunset Rd. #2104
Las Vegas, NV 89113

July 15, 2013

R. Michael Waller
Megan E. Gray
Federal Trade Commission
600 Pennsylvania Avenue NW
Mailstop M-8102B
Washington, D.C. 20580

Sent via: First Class Mail Return Receipt & by email

Re: Request for release of money for living expenses and for retaining legal counsel.

Dear Mr. Waller & Ms. Gray:

In the hearing on February 14, 2013 Mr. David Koch asked Judge Du for the release of money for legal and living expenses.

```
MR. KOCH: I don't know if it's a similar situation,
but with respect to any asset freeze that would be in place, and
that there would be the ability to request from the receiver
reasonable living expenses for some period of time so that
defendants can be able to live, and then get a new job, and do
whatever they need to do and also legal fees to be requested from
those to the receiver.

THE COURT: The order allows for that.
```

As stated in the hearing most of my personal funds that were seized came from an inheritance my wife received after her Mother died. As is evident now by the financial records I was not even on Ideal's payroll for months prior to the TRO.

Based on the recent Motion to Intervene filed by Zeal Funding and the fact we have four other companies named in the complaint who have agreed to provide sign affidavits stating my none involvement with their company, I have decided I do not want to settle and I need to hire an attorney to help with my defense.

Based on the fact that my legal expenses will far exceed all of my seized funds I hereby request a full release of all of my personal funds for living and legal expenses.

Sincerely,

Steven Sunyich

Exhibit D

Gray, Megan             Aug 10 (7 days ago)

to stevesunyich, Michael, Melissa, chris.sunyich, Shawn, Richard

You are all, of course, welcome to go all the way through trial on this matter. But I point out, again, the Sunyich family does not appear to understand the basic aspects of the law, or what is required to "win" or even "lose less." As just one example, there is no jury here – a judge decides the case. We have no doubt that the FTC will overwhelmingly prevail in this case, just has it has done so with the judge in not one, but two, prior occasions (the temporary restraining order, and the preliminary injunction). I will be traveling off and on until September 5, but Waller is back from paternity leave and readily accessible. You may want to make a genuine counter offer – expressly indicating your willingness to access all provisions, contingent on X change to Z provision,  so it reads "...." that sort of thing.

Megan

**From:** Gray, Megan
**Sent:** Saturday, August 10, 2013 6:00 PM
**To:** 'stevesunyich@gmail.com'; 'Michael Sunyich'
**Cc:** 'Melissa Gardner'; 'chris.sunyich@gmail.com'; 'Shawn Sunyich'; Waller, Richard; Gray, Megan
**Subject:** RE: draft settlement terms

ss gmail <stevesunyich@gmail.com>   Aug 12 (5 days ago)

to Megan, Michael, Melissa, chris.sunyich, Shawn, Richard

Dear Megan,

You are absolutely correct of course we don't "understand the basic aspects of the law," we are not attorneys.  This is why we would like to be able to hire an attorney.

I also appreciate your view of why you have prevailed on the last two decisions with the Judge, however I see the facts very different.  In the first ruling the Judge was given very inaccurate information.  I want to believe this inaccurate information was provided by accident or oversite.  Here is some of the initial inaccurate information that was provided:

1. Of the 19 written complaints I was not an owner or officer of one of the companies named in those complaints.

2. Of the few written complaints that Ideal did customer service work for, EVERY one of the people who were billed were refunded so there were no damages.

3. In your own words Zeal is the only company with money and not one of their owners or officers have been named after two attempts. I think everyone knows at this point Ideal and I had no connection to Zeal.

4. Brian Godfrey the owner of Fiscal Fitness will testify that we did customer service for them and I was not an owner, officer or signer on any of their bank or merchant accounts.

5. I am almost 60 years old with no criminal history, no previous civil cases and no judgments and no money trail that connects me to the $25M. And the same true for Shawn, Michael, Chris and Melissa.

6. And one additional small detail, if I took $25M where is the money? My income in 2012 was only $16,652 and I was not even on Ideal's payroll for over seven months before the February 1st raid. Like Mr. McNamara stated to the Judge, "I'm scratching my head over that one."

7. Income for 2011 was $126K and 2010 $193K, hardly enough to overwhelm anyone of a major $25M kingpin.

8. Ideal is a 20+ year-old company that has been selling online financial services for over a decade. We have thousands of customers we provided financial services too. If we had access to our computers we could show you this. But it is my guess you know this and that is why Chris and my computers were never returned.

9. Granted if Jared is guilty I might have played a role in his schemes by making him an employee and allowing him too much access to the inter workings of our company, but I was never involved in wrongfully billing people without their knowledge.

10. I could go on but I believe if just this information were accurately presented to the Judge I believe she would have ruled differently.

In the hearing on February 14th we again had no way to present an argument because we had no way to hire an attorney prior to the hearing. So the decision was based on us not being able to properly defend ourselves because we could not hire an attorney and the Receiver providing critical false inaccurate information to the Judge. Below is from the Court transcript where Mr. McNamara made the false and misleading statements:

MR. McNAMARA: And have a lot of other things going

on. But to the extent you had any additional questions, I
just wanted to offer myself to address those. And short of
that, the one thing I would note is that these financial
statements that Mr. Waller addressed are critically
important. <u>We found very little way -- very little in the</u>
<u>way of assets in these companies.</u> And I can tell you that
it -- I am scratching my head about that. Last year, just
out of reserve accounts that had been closed, <u>Mr. Steve</u>
<u>Sunyich took in more than $700,000</u> just in, you know, the
reserve account return. That's not the operations of the
business. That's the return account. But we are not seeing
it in any of the accounts.

Maybe the reason the Receivers found very little "in the way of assets in these
companies" is we were not involved in a $25M scam and were just providing basic
services as we have stated over and over and we have been doing for over a decade. And
the fact is I never saw a dime of the $700,000 he is referring too. If this were an honest
mistake Mr. McNamara would have notified the Judge when he discovered the true facts
and corrected his false statement.

I believe if the accurate truth was presented to the Judge prior to the TRO or at our
hearing on the 14th the preliminary injunction would never had been put in place. What I
don't understand is why the FTC can't just admit they made a mistake like the FBI did
when they realized they mistakenly arrested Paul Curtis?

I recently spent over three hours with the producer of a documentary about the abuses in
our Federal Government. The documentary started out to be a story about Jeremy
Johnson a high profile businessman who lives in St. George. As they started their
investigation the focus changed to corruption in our Government. When I asked what
had caused them to change directions they said it was based on the overwhelming
evidence and documentation of corruption and they were contacting others like me to see
if the same kind of corruption existed.

I explained our case in detail and said there is one BIG different, we don't have any
money and we did nothing wrong. Upon learning about the seized money, he said it
sounded like Nazi Germany and the FTC is the new Gestapo. He asked the same
question everyone asks when they hear our story, "how can the Government just seize
your bank account without proof or a trial?" And "what happened to being innocence
until proven guilty?" When I told him if this could happen to us it could happen to
anyone and he said these are things the American people need to be made aware of.

He asked if we had seen evidence of Federal authorities in our case lying, blackmailing,
bribing and/or threatening defendants or witnesses. I shared the false statements made by
Mr. McNamara and all of the facts noted above and said I was hoping with the evidence
we were providing and the fact we have no money or money trail that leads to us we will
get dropped from the case. I could tell this disappointed him.

I asked if he could share some of the overwhelming information they had received on the Jeremy Johnson case and he contacted Mr. Johnson who agreed to send me a soft copy of his documentation summary.  It was interesting it was addressed to Daniel Bogden, so I thought I better attach a copy for your review.  He said they have confirmed there is an on going investigation by both the State of Utah and the FBI Public Corruption Division against some of the individuals named in Mr. Johnson's criminal case and that there were several high-ranking Senators and Congressmen they had been in contact with, but he would not share any names.

I told him I needed some time to think about what he was asking and my involvement.  My first choice is to be dropped from this case, as there is nothing that links me to the $25M you are looking for.  As you know my case is different than the other members of my family.  Almost all of the money that was seized belonged to my wife and was part of the inheritance she received when her Mother died.

If you are not going to drop me from this case I plan to keep asking for what the Judge Du said at our hearing, "The order allows for that."   At least it will show both the unfairness and the injustice to the jury and the American people when they watch the documentary.  I think the Judge was very clear in her statement above because she knows that Constitutional protections have been breached and she wants to make sure she is on the right side of the law.

The American public has become frustrated with our Government and how their Constitutional rights and protections are eroding and being trampled on.  Let's not give them more reasons to feel afraid and become even more angry.  Please look at the facts and do the right thing and drop my family and I from this case.

Once again I ask for the release of my seized money for living and legal expenses.

Thanks,

Steve

Exhibit E

**Affidavit by Brian Godfrey:**
**FTC v. Ideal Financial Solutions, Inc., et al.**
**Case No.: 13-CV-00143-MMD-GWF**

Comes now Brian Godfrey. Hereinafter "Affiant", who does solemnly affirm, declare, and state as
follows:

1. Affiant is competent to state the matters set forth herein;
2. Affiant has first hand knowledge of the facts stated herein;
3. All the facts herein are true, correct, and complete, admissible as evidence and if called upon as
   a witness, Affiant will testify to their veracity;
4. I met Jared Mosher at a Christmas party in late 2010, while traveling to Utah, and I was told
   about a business opportunity he was offering.
5. Mr. Mosher explained he was going to be setting up several new businesses that would be
   working with people who had applied for a payday loan and been denied a loan. The new
   businesses would offer services to help the customers who had been denied a loan to help them
   correct mistakes entered on the customer's loan applications and then allow the customers to
   reapply for a new loan with new lenders.
6. To the best of my knowledge I was involved with Mr. Mosher with just one company named
   Fiscal Fitness. Over the course of several months I signed several merchant applications. I was
   told that Fiscal Fitness would contract with Ideal Financial Solutions, Inc., and its subsidiaries to
   provide their online financial services to the new customers who applied for a payday loan and
   been denied. In addition I was told that Bracknell Shore would be providing customer service
   and Ascot Crossing would be providing the website development.
7. Because I had been working with Ideal Financial Solutions, Inc. for several years, and I knew they
   had good customer service. In addition I felt that their online financial services would be of
   great benefit to the new customers of Fiscal Fitness who had been denied a payday loan and
   needed financial assistance.
8. I was told that even though my name would be on Fiscal Fitness business accounts, Mr. Mosher
   would be providing the customers from other companies he was working. Mr. Mosher claimed
   he had signed contracts with his lead providers and opinion letters from their attorney stating
   that the leads were in compliance with all State and Federal laws.
9. I was told I would be paid $500 per month for each active merchant and bank account I was a
   signer on. The amount eventually decreased to $250 per month.
10. I was told that even though my name might be listed as a signer on the bank accounts of Fiscal
    Fitness, I was not authorized to write checks, use a debit card or transfer funds from the bank
    account without Mr. Mosher's approval. Mr. Mosher told me if I ever touched the bank account
    he would cancel our agreement and I would not get paid. I was merely a staw-man to the
    account.
11. My only duty with respect to my involvement with Mr. Mosher and Fiscal Fitness was to be a

Page 1- Affidavit in Support

signer on the merchant accounts.

12. Over the course of the next year Mr. Mosher asked me to be a signer on several merchant accounts applications. I never withdrew a penny from these accounts that I was a signer on.

13. To the best of my knowledge Mr. Mosher, or his other associates, had 100% control over the lead providers who provided the customers, as well as the merchant and bank accounts.

Further Affiant Sayeth naught:

_Brian Godfrey_

State of Tennessee )
) ss:
County of Blount )

Subscribed or sworn to (or affirmed) before me, a Notary Public, on this __6__ day of __June__, 2013, by Brian Godfrey, who proved to me on the basis of satisfactory evidence to be the person who appeared before me and signed the above instrument of his own free act and will.

Notary Signature
Commission
expires 8/24/2014

Seal:

Exhibit F

**Affidavit by Robert Dahl:**
**FTC v. Ideal Financial Solutions, Inc., et al.**
**Case No.: 13-CV-00143-MMD-GWF**

Comes now Robert Dahl. Hereinafter "Affiant", who does solemnly affirm, declare, and state as follows:

1. Affiant is competent to state the matters set forth herein;
2. Affiant has first hand knowledge of the facts stated herein;
3. All the facts herein are true, correct, and complete, admissible as evidence and if called upon as a witness, Affiant will testify to their veracity;
4. Sometime in late 2010 Steven Sunyich introduced me to a business acquaintance named Jared Mosher that Ideal Financial was starting to work with. I was told that Mr. Mosher was looking for a partners who had good credit.
5. Mr. Mosher explained he was going to be setting up several new businesses that would be working with people who had applied for a payday loan and had been denied a loan. The new businesses would offer services to help the customers who had been denied a loan by other lenders to correct mistakes entered on the customer's loan applications and then allow the customers to reapply for a new loan with new lenders.
6. To the best of my knowledge I was only involved with one company named ShawShank LLC, however I did sign several merchant applications over the course of many months. I was told that ShawShank would be contracting with Ideal Financial Solutions, Inc., and its subsidiaries to provide their online financial services to the new customers who applied for a payday loan and been denied. In addition I was told that Bracknell Shore would be providing customer service.
7. Because I was a shareholder in Ideal Financial Solutions, Inc., and had known Steve Sunyich for years and felt that Ideal Financial Solutions, Inc. services would be of great benefit to the new customers of ShawShank who had been denied a payday loan and needed financial assistance I agreed to the proposal.
8. I was told that even though my name would be on the ShawShank businesses accounts, Mr. Mosher would be providing the customers. Mr. Mosher claimed he had signed contracts with his lead providers and opinion letters from their attorney stating that the leads were in compliance with all State and Federal laws.
9. I was told I would be paid $1,000 per month for each active merchant and bank account I was a signer on.
10. I was told that even though my name might be listed as a signer on the bank account of ShawShank, I was not authorized to write checks, use a debit card or transfer funds from the bank account without Mr. Mosher's approval. Mr. Mosher told me if I ever touched the bank account he would cancel our agreement and I would not get paid. I was merely a straw man for Mr. Mosher on these accounts.
11. My only duty with respect to my involvement with Mr. Mosher and ShawShank was to be a signer on the merchant accounts.

12. To the best of my knowledge Mr. Mosher, had 100% control over the lead providers and customers, as well as total control over the merchant and bank accounts.

13. At no time was I aware of Steven or Chris Sunyich or any of the other members of the Sunyich family being a signer on or having any financial control over ShawShank or any of its bank accounts. It was my understanding that Ideal Financial provided basic outsourced products and services to ShawShank as it did with other companies.

14. To the best of my knowledge Ideal Financial Solutions, Inc. was not involved with customers in the payday loan industry prior to working with Mr. Mosher in late 2010.

15. Sometime in mid 2012 Steven Sunyich told me that Mr. Mosher had decided to work with a different online financial service company and Ideal Financial Solutions, Inc. was no longer working with him.

Further Affiant Sayeth naught:

Robert Dahl

| State of Utah | ) |
| | ) ss: |
| County of Utah | ) |

Subscribed or sworn to (or affirmed) before me, a Notary Public, on this  5  day of July, 2013, by Robert Dahl, who proved to me on the basis of satisfactory evidence to be the person who appeared before me and signed the above instrument of his own free act and will.

Notary Signature

Seal:

HILARY PALMER
Notary Public
State of Utah
Comm. No. 656239
My Comm. Expires Jun 1, 2016

Page 2- Affidavit in Support

Exhibit G

**Affidavit by Teri Bunker:**
**FTC v. Ideal Financial Solutions, Inc., et al.**
**Case No.: 13-CV-00143-MMD-GWF**

Comes now Teri Bunker. Hereinafter "Affiant," who does solemnly affirm, declare, and state as follows:

1. Affiant is competent to state the matters set forth herein;
2. Affiant has firsthand knowledge of the facts stated herein;
3. All the facts herein are true, correct, and complete, admissible as evidence and if called upon as a witness, Affiant will testify to their veracity;
4. I was the company's office manager from August 2002 through January 2013. In April 2007 I moved to Riverton, UT and worked from a home office. I communicated with other employees by email, Skype and telephone.
5. My duties included bookkeeping for Ideal Financial Solutions, Inc., Ascot Crossing, LLC, and Bracknell Shore, LLC. I was a signer on bank accounts for each entity.
6. Bookkeeping for other entities was outsourced to an independent contractor. I agreed to be a signer on bank accounts for other entities for the sole purpose of downloading bank statements and transactions which I emailed to the contractor.
7. Ideal Financial Solutions began working with Jared S. Mosher in late 2010. Mr. Mosher became an employee on April 16, 2011 and assumed management of the accounting department. The accounting department was comprised of Mr. Mosher, Mr. Brown and me. I reported directly to Mr. Brown and he reported to Mr. Mosher.
8. Mr. Brown and Mr. Mosher gave me explicit instructions that no funds were to be transferred and no payments were to be made without Mr. Mosher's approval. We were not to make payments requested by Steve or Chris Sunyich unless they were approved by Mr. Mosher.
9. Mr. Brown asked me to create an accounts payable aging report which I updated and emailed to Mr. Brown and Mr. Mosher every week. Mr. Brown then created a report which listed bank account balances for all active entities and recommendations as to how much money should be paid to Ascot Crossing and Bracknell Shore. He also recommended which bills should be paid. Mr. Mosher reviewed Mr. Brown's report and authorized transfers and bill payments. When the report was finalized Mr. Brown instructed me to make payments from the entities to Ascot Crossing and Bracknell Shore. I used Ideal's online bill payment system, provided by FIS Global (formerly Metavante) with whom Ideal had a long-standing relationship, to process ACH payments.
10. Utilizing merchant account data, Mr. Mosher created invoices in the amount of the payments for services provided by Ascot Crossing and Bracknell Shore and emailed them to me so I could input the data into QuickBooks.
11. To the best of my knowledge, the owners of the various entities were not involved in financial decisions or management of their entities. They were not allowed to withdraw or transfer money from their company bank accounts. I did not manage or make financial decisions for Bunker Hillside, LLC.
12. Scott M. Manson was hired as Chief Financial Officer on August 22, 2011 but he was not

involved in day-to-day accounting. Mr. Mosher continued to manage all payments and transfers. Mr. Manson was not allowed to make payments or transfers unless they were approved by Mr. Mosher.

13. Sometime in 2011 I learned that Mr. Mosher was appointed President of Ascot Crossing and that he was going to manage all activities dealing with payday loan customers.

14. Mr. Mosher terminated his employment in May 2012 and Mr. Manson assumed management of the accounting department. To the best of my knowledge Ideal Financial Solutions and its subsidiaries had no further dealings with Mr. Mosher or any company he was affiliated with.

15. Ideal Financial Solutions and its subsidiaries provided online financial services, fulfillment, customer service, etc. before they started working with Mr. Mosher; they provided the same products and services while he was an employee; and they continued providing those same products and services after he left.

Further Affiant sayeth naught:

_____
Teri Bunker

State of Utah        )
                     ) ss:
County of Salt Lake  )

Subscribed or sworn to (or affirmed) before me, a Notary Public, on this ___7___ day of ___June___, 2013, by Teri Bunker, who proved to me on the basis of satisfactory evidence to be the person who appeared before me and signed the above instrument of his own free act and will.

_____
Notary Signature

Seal:

```
TY P DUKE
Notary Public
State of Utah
Comm. No. 658037
My Comm. Expires Aug 28, 2016
```

Page 2- Affidavit in Support

### AFFIDAVIT BY PAUL CURRIE:
### FTC v. IDEAL FINANCIAL SOLUTIONS, INC., ET AL.
### CASE NO.: 13-CV-00143-MMD-GWF

COMES NOW PAUL CURRIE. HEREINAFTER "AFFIANT", WHO DOES SOLEMNLY AFFIRM, DECLARE, AND STATE AS FOLLOWS:

1. AFFIANT IS COMPETENT TO STATE THE MATTERS SET FORTH HEREIN;
2. AFFIANT HAS FIRST HAND KNOWLEDGE OF THE FACTS STATED HEREIN;
3. ALL THE FACTS HEREIN ARE TRUE, CORRECT, AND COMPLETE, ADMISSIBLE AS EVIDENCE AND IF CALLED UPON AS A WITNESS, AFFIANT WILL TESTIFY TO THEIR VERACITY;
4. SOMETIME IN LATE 2010 STEVEN SUNYICH INTRODUCED ME ABOUT A BUSINESS OPPORTUNITY THAT WAS BEING OFFERED BY A NEW CLIENT, THAT IDEAL FINANCIAL SOLUTIONS, INC., WAS JUST STARTING TO WORK WITH NAMED JARED MOSHER.
5. MR. MOSHER EXPLAINED HE WAS GOING TO BE SETTING UP SEVERAL NEW BUSINESSES THAT WOULD BE WORKING WITH PEOPLE WHO HAD APPLIED FOR A PAYDAY LOAN AND HAD BEEN DENIED A LOAN.  THE NEW BUSINESSES WOULD OFFER SERVICES TO HELP THE CUSTOMERS WHO HAD BEEN DENIED A LOAN BY OTHER LENDERS TO CORRECT MISTAKES ENTERED ON THE CUSTOMER'S LOAN APPLICATIONS AND THEN ALLOW THE CUSTOMERS TO REAPPLY FOR A NEW LOAN WITH HIS LENDERS NETWORK.
6. TO THE BEST OF MY KNOWLEDGE I WAS INVOLVED WITH MR. MOSHER WITH TWO COMPANIES CHANDON GROUP AND US DEBT RELIEF. I WAS TOLD THAT BOTH THE CHANDON GROUP AND US DEBT RELIEF WOULD CONTRACT WITH IDEAL FINANCIAL SOLUTIONS, INC., AND ITS SUBSIDIARIES TO PROVIDE THEIR ONLINE FINANCIAL SERVICES TO THE NEW CUSTOMERS WHO APPLIED FOR A PAYDAY LOAN AND BEEN DENIED.  IN ADDITION I WAS TOLD THAT BRACKNELL SHORE WOULD BE PROVIDING CUSTOMER SERVICE.
7. BECAUSE I WAS A SHAREHOLDER IN IDEAL FINANCIAL SOLUTIONS AND HAD WORKED WITH IDEAL FINANCIAL FOR SEVERAL YEARS AND FELT THAT THEIR ONLINE FINANCIAL SERVICES WOULD BE OF GREAT BENEFIT TO THE NEW CUSTOMERS WHO HAD BEEN DENIED A PAYDAY LOAN AND NEEDED FINANCIAL ASSISTANCE.
8. I WAS TOLD THAT EVEN THOUGH MY NAME WOULD BE ON THE BUSINESSES BANK AND MERCHANT ACCOUNTS, MR. MOSHER WOULD BE PROVIDING THE LEADS AND CUSTOMERS.  MR. MOSHER CLAIMED HE HAD SIGNED CONTRACTS WITH HIS LEAD PROVIDERS AND OPINION LETTERS FROM THEIR ATTORNEY STATING THAT THE LEADS WERE IN COMPLIANCE WITH ALL STATE AND FEDERAL LAWS.
9. I WAS TOLD I WOULD BE PAID $1,000 PER MONTH FOR EACH ACTIVE MERCHANT ACCOUNT I WAS A SIGNER ON.
10. I WAS TOLD THAT EVEN THOUGH MY NAME MIGHT BE LISTED AS A SIGNER ON THE BANK ACCOUNTS, I WAS NOT AUTHORIZED TO WRITE CHECKS, USE A DEBIT CARD OR TRANSFER FUNDS FROM THE BANK ACCOUNT WITHOUT MR.

MOSHER'S APPROVAL.

11. MY ONLY DUTIES WITH RESPECT TO MY INVOLVEMENT WITH MR. MOSHER AND BOTH THE CHANDON GROUP AND US DEBT RELIEF BUSINESSES WAS TO BE A SIGNER ON THE MERCHANT ACCOUNTS.

12. OVER THE COURSE OF THE NEXT YEAR MR. MOSHER ASKED ME TO BE A SIGNER ON A COUPLE OF HIS OTHER COMPANIES. I NEVER WITHDREW A PENNEY FROM ANY OF THE BANK ACCOUNTS I WAS A SIGNER ON.

13. TO THE BEST OF MY KNOWLEDGE MR. MOSHER CONTROL THE LEAD PROVIDERS WHO PROVIDED THE CUSTOMERS, AS WELL AS THE MERCHANT AND BANK ACCOUNTS.

FURTHER AFFIANT SAYETH NAUGHT:

_Paul Currie_

**PAUL CURRIE**

STATE OF TEXAS          )
                        ) SS:
COUNTY OF COLLIN        )

SUBSCRIBED OR SWORN TO (OR AFFIRMED) BEFORE ME, A NOTARY PUBLIC, ON THIS 1ST DAY OF August , 2013, BY PAUL CURRIE, WHO PROVED TO ME ON THE BASIS OF SATISFACTORY EVIDENCE TO BE THE PERSON WHO APPEARED BEFORE ME AND SIGNED THE ABOVE INSTRUMENT OF HIS OWN FREE ACT AND WILL.



DUSTY LEWIS
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 12/3/16

**NOTARY SIGNATURE**

SEAL:

Exhibit I

pAffidavit by Robert Taylor Yates:
FTC v. Ideal Financial Solutions, Inc., et al.
Case No.: 13-CV-00143-MMD-GWF

Comes now Robert Taylor Yates. Hereinafter "Affiant", who does solemnly affirm, declare, and state as follows:

1. Affiant is competent to state the matters set forth herein;
2. Affiant has first hand knowledge of the facts stated herein;
3. All the facts herein are true, correct, and complete, admissible as evidence and if called upon as a witness, Affiant will testify to their veracity;
4. Steven and Chad Sunyich introduced me to Ideal Financial Solutions around 2001. They were in the preliminary stages of building a company to offer strategic cash flow management and debt elimination services to the general public to help families overcome financial burden associated with excessive debt and poor knowledge of how to affectively manage personal cash flow.
5. Around this time I began working with Ideal Financial Solutions as an independent contractor, yet I was never a W2 employee of the organization. I worked part-time off and on over the course of the next 10 years with the company helping clients build plans to eliminate debt and prepare for establishing a life of wealth and prosperity.
6. My specific focus with Ideal Financial Solutions was to guide and educate clients that were utilizing the strategic software solutions that the company offered as a service to ensure that each client and their family understood and had access to the various resources that were available for them to use at their disposal.
7. These resources included a member center by the name of idealcashsecrets.com that provided information on how to manage cash flow; pay down secured and unsecured debt, manage payment strategy to creditors to ensure that each client would maximize interest savings. Budgeting strategy to manage payment of fixed and variable expenditures as well as ways of increasing overall monthly household cash flow and income were also included in this site.
8. In addition to the member's center, clients also had access to an additional two-part online software system known as IDebtManager and IBillManager. IDebtManager was a sophisticated proprietary online software solution that created a unique customized financial profile for each client allowing them to evaluate how long it will take them to pay off all of their secured and unsecured consumer debt over the course of their program. This software program was dynamic and adjusted the balances automatically of each client's payment structure and plan. In addition, each client had the ability to self-manage his or her balances, payment amounts as well as interest rates of each creditor in the system. By strategically applying additional cash flow that Ideal Financial helped each client create, the client could then apply this extra money known as margin to the priority debt in his or her plan.
9. IBillManager was an additional optional service that many clients chose to use in their cash flow management and debt elimination plan that allowed for each of their payments to creditors as

well as all of their other bills, such as utilities, to be paid automatically. This tool dramatically increased the effectiveness of the application of positive cash flow (margin) to the client's priority creditor and was based off the principle of dollar cost averaging when investing. IBillManager was a third party software solution that was customized and integrated for Ideal Financial Solutions. The company that ran this service for Ideal Financial was a company by the name of Metavante Technologies, Inc. Metavante Technologies, Inc. was acquired in late 2009 by Fidelity National Information Services, Inc. and is known as (FIS).

10. FIS delivers banking and payments technologies to more than 14,000 financial institutions and businesses in more than 90 countries worldwide. FIS provides financial institution core processing, and card issuer and transaction processing services, including the NYCE Network. FIS maintains processing and technology relationships with 40 of the top 50 global banks, including nine of the top 10. FIS is a member of Standard and Poor's (S&P) 500® Index and has been ranked the number one overall financial technology provider in the world by The American Banker newspaper and the research firm Financial Insights in their annual "FinTech 100" rankings. Headquartered in Jacksonville, Fla., FIS employs approximately 30,000 on a global basis. FIS is listed on the New York Stock Exchange under the "FIS" ticker symbol. For more information about FIS see www.fidelityinfoservices.com.

11. Ideal Financial Solutions chose to use banking tools by Metavante Technologies because they clearly offered the best and most powerful online secure banking tools in the industry worldwide. We have a significant amount of clients that used these services for well over 5 years who found IBillManager services to be the most effective way to manage payments to creditors that they have ever used. Some clients had payments being processed to over 100 creditors before their services were shut off.

12. A powerful option that IBillManager offered was that it was connected to the IDebtManager platform so that when payments to a client's creditor took place, it automatically updated their IDebtManager plan so that the client could have continuous visibility into their get out of debt date. The average client could expect to be debt free in approximately 8 years which normally included paying off a 30 year mortgage lien saving the average client well over $100,000 in interest expense that they would have paid if they were not active in our program trying to pay off debt on their own.

13. The services that Ideal Financial Solutions provided to each client was invaluable and consisted of quarterly follow ups, weekly and monthly one-on-one coaching, as well as unique services tailored to meet the needs of each client and their financial situation. Overall, the company was known as being a pioneer and leader in the debt and cash flow management industry. The primary focus was to enable each client to gain control of their overall financial situation and to ensure that they met their goal to become debt free and prepare for true financial independence.

Further Affiant Sayeth naught:

R. Taylor Yates

Page 2- Affidavit in Support

Robert Taylor Yates

State of Utah          )
                       ) ss:
County of Utah         )

Subscribed or sworn to (or affirmed) before me, a Notary Public, on this ___ day of _Aug_, 2013, by Taylor Yates, who proved to me on the basis of satisfactory evidence to be the person who appeared before me and signed the above instrument of his own free act and will.

Notary Signature

Seal:

T. SHAWN CONLEY
Notary Public
State of Utah
Comm. No. 653715
My Comm. Expires Mar 16, 2016

Page 3- Affidavit in Support