1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3

4

5

6

7

Federal Trade Commission,

          Plaintiff

vs.

Ideal Financial Solutions, Inc., et al.,

          Defendants

Case No.: 2:13-cv-00143-JAD-GWF

**Order Granting in Part Motion for
Summary Judgment
[Doc. 170]**

8

9        This trade-enforcement action alleges a wide-ranging fraud scheme in which Ideal Financial

10  Solutions, Inc., through a host of shell entities, purchased consumer bank and credit card information

11  from payday-loan vendors and charged unwitting consumers a fee for financial services never

12  provided.  The Federal Trade Commission sued Ideal, its related entities, and the people who control

13  them.  Defaults and consent judgments have been entered against the majority of the defendants, and

14  the FTC now moves for summary judgment against the remaining defendants on all claims.  Having

15  evaluated the admissible evidence, I grant summary judgment on liability, but I find that a flaw in the

16  FTC's evidentiary submission precludes summary judgment on the remedies the FTC seeks.

17  **I.**    **Procedural History**

18        The FTC filed this action against Ideal Financial Solutions, Inc.; Ascot Crossing, LLC;

19  Bracknell Shore, Ltd.; Chandon Group, Inc.; Avanix, LLC; Fiscal Fitness, LLC (the Corporate

20  Defendants); and Steven Sunyich, Michael Sunyich, Chris Sunyich, Shawn Sunyich, Melissa

21  Sunyich Gardner, Kent Brown, and Jared Mosher (Individual Defendants),[1] alleging they

22  orchestrated a fraud scheme using unfair billing practices (count 1), deceptive billing practices

23  (count 2), and deceptive statements that consumers authorized payment (count 3), all in violation of

24  the FTC Act, 15 U.S.C. § 45 *et seq.*[2]  Shortly after filing the complaint, the FTC successfully moved

25  for a temporary restraining order—followed by a preliminary injunction—under which it seized

26

27

28

---

[1] Doc. 1.  Jared Mosher was brought into this action by the amended complaint.  Doc. 32.
Although the docket also reflects the presence of a "Shane Mosher," he does not appear in either
version of the complaint.

[2] Doc. 32.

financial assets.[3]  The court appointed a receiver to oversee the operation of the Corporate

Defendants.[4]  A clerk's default was entered against all of the Corporate Defendants,[5] and the FTC

entered consent judgments against Kent Brown and Shawn Sunyich,[6] leaving Steven Sunyich, Chris

Sunyich, Michael Sunyich, Melissa Sunyich Gardner, and Jared Mosher[7] as the only active

defendants.

　　　　The FTC now moves for summary judgment on all claims against these remaining

defendants.[8]  Only Steven Sunyich, Michael Sunyich, Chris Sunyich, and Melissa Sunyich Gardner

responded to the motion.[9]  Steven Sunyich avers that the FTC has filed "mountains of worthless

documents . . . in an attempt to hide the simple truth, THEY DO NOT HAVE A CASE" and that a

number of the funds seized belong to a non-party.[10]  Chris Sunyich argues that the FTC has

"burdened" the parties with excessive documents but that the FTC cannot point to any wrongdoing

that specifically implicates him or any of the companies he controls.[11]  Michael Sunyich's one-page

response states baldly that "there is absolute genuine dispute to ALL claims made by Plaintiff

---

[3] Docs. 9, 18, 49.

[4] *Id*.

[5] Docs. 190, 191.

[6] Docs. 192, 193.

[7] Court mailings to Jared Mosher have been returned undelivered for nearly a year as he has apparently not updated his mailing address.  *See* Docs. 199, 203, 205, 208, 215.

[8] The motion was also brought against Brown and Shawn Sunyich, and against the Corporate Defendants.  The claims against Brown and Shawn Sunyich have been resolved by consent judgment.  Docs. 192, 193.  When default was entered against the Corporate Defendants, their liability was established.  *See Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam) (a party's default conclusively establishes its liability, but it does not establish the amount of damages); *accord Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

[9] Docs. 180, 181, 183, 184.  After the FTC filed its motion, all defendants received a notice informing them that, to properly oppose the motion, they must file opposing points and authorities, admissible evidence, and a statement of facts under Local Rule 56-1.  Doc. 179.

[10] Doc. 180 at 1–2.

[11] Doc. 183 at 1–2.

Federal Trade Commission."[12]  Like Michael's submission, Melissa Sunyich Gardner's two-page argument contends there is "genuine dispute to ALL claims made by Plaintiff Federal Trade Commission," refers to her now-denied motion to dismiss, and requests that "both Plaintiff and Defendants should be ordered to work together in a productive manner to create guidelines and policies in a very unregulated misunderstood industry."[13]  On this briefing, I now consider the state of the evidence.

## II.     The State of the Evidence

The court may only consider admissible, properly authenticated evidence on summary judgment.[14]  Authentication is a "condition precedent to admissibility" that is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims."[15]  To properly present or oppose a summary judgment motion supported by admissible evidence, litigants must comply with this district's Local Rule 56-1, which requires "a concise statement setting forth each fact material to the disposition of the motion, which the party claims is or is not genuinely in issue, citing the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other evidence upon which the party relies."[16]  It is not enough to simply attach admissible evidence to the motion; that evidence must be properly presented.  Parties who fail to provide pinpoint citations to evidence supporting assertions made in a statement of disputed or undisputed facts risk exclusion of that evidence.  The court is not required to "paw over files without the assistance from the parties" in order to evaluate their contentions.[17]

---

[12] Doc. 181 at 1; *see* Doc. 190.

[13] Doc. 184 at 1; *see* Doc. 190.

[14] *Orr v. Bank of Am.* 285 F.3d 764, 774 (9th Cir. 2002).

[15] *Id.* (citations omitted).

[16] D. Nev. L.R. 56-1.

[17] *Id.* at 774–75 (9th Cir. 2002).  I consider the admissible evidence submitted elsewhere in the record as it relates to each defendant.  I will not, however, dig through each of the hundreds of docket entries to hunt for evidence to support defendants' arguments.  *See, e.g., Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994) ("District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits."); *see also United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

3

Even where there has been a complete failure to respond in accordance with a local rule, however, I may not grant a summary-judgment motion merely because it is (effectively) unopposed. I must consider whether the undisputed facts warrant entry of judgment against the non-moving parties.[18]  Where, as here, summary judgment is sought against pro se defendants, I consider all of their supported facts offered in motions and pleadings if made on personal knowledge and under penalty of perjury.[19]  And I construe all evidence in the light most favorable to the defendants.[20]

### A.   Defendants' Evidentiary Record

None of the four answering defendants has submitted any admissible evidence in his or her brief response to the motion for summary judgment[21] or made a colorable attempt to comply with Local Rule 56-1.  Steven Sunyich references two exhibits: (A) the FTC's expert report by Lisa T. Wilhelm, which he offers only to discredit it as "very ONE SIDED"[22] and (B) Steven's unsigned, undated, unauthenticated letter response to that report.[23]  None of this is reliable evidence on summary judgment, so I choose to disregard it.[24]  But looking through the entire record as I am obligated to do with these pro se defendants, I note that Steven's answer contains seven properly authenticated affidavits; I consider them and incorporate them below in my description of the undisputed material facts.[25]

### B.   The FTC's Evidence

The FTC's multitude of exhibits—which span approximately 1,880 pages— are not all

---

[18] *See Heinemann v. Setterberg*, 731 F.3d 914, 917 (9th Cir. 2013).

[19] *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted).

[20] *See FTC v. Stefanchick*, 559 F.3d 924, 927 (9th Cir. 2009).

[21] *See* Docs. 180, 181, 183, 184.

[22] Doc. 180 at 2; Doc. 180-1 (formatting in original).

[23] Doc. 180-2.

[24] *See* Fed. R. Evid. 901(b)(4).

[25] Doc. 84 at 12–35.  These are the affidavits of the Sunyiches, Doc. 84 at 12–23; Brian Godfrey, Doc. 84 at 24–25;  Robert Dahl, Doc. 84 at 26–27;  Paul Currie, Doc. 84 at 28–29; Joseph Montabano, Doc. 84 at 30; Terri Bunker, Doc. 84 at 31–32; and Robert Taylor Yates, Doc. 84 at 33–35.

1    admissible.  The FTC introduces many of its exhibits by relying on affidavits from FTC employees

2    or low-level employees of subpoenaed companies, who state that certain documents were produced

3    in response to subpoenas or seized from Ideal's workplace.  But the affidavits themselves do not

4    specify the attached documents, nor has the FTC attached any supplemental declaration attesting to

5    their authenticity.  In addition to finding those documents lack foundation, I also decline to find that

6    the particular characteristics of these documents meet the admissibility requirements of Federal Rule

7    of Evidence 901(b)(4).

8           Finally, I disregard Wilhelm's expert report, attached at PX34.[26]  For an expert opinion to be

9    considered on summary judgment, its contents must be sworn under penalty of perjury to be true and

10   correct.  Courts in the Ninth Circuit "have routinely held that unsworn expert reports are

11   inadmissible."[27]  Wilhelm's report is signed but unsworn.[28]  I therefore disregard it.

12   **C.    Undisputed Facts**

13          The evidence I do find admissible and exercise my discretion to consider leaves me with the

14   following undisputed facts:

15          *1.     Ideal Financial Solutions and Its Unauthorized Charges to Consumer Accounts*

16          Ideal Financial Solutions is a publicly traded corporation that has been in business for more

17   than 20 years.[29]  It purchased consumer financial account numbers and data or leads directly from

18   data providers, often in the form of consumer payday-loan applications that online payday lenders

19

20

21

22          [26] Doc. 175-3.

23          [27] *Harris v. Extendicare Homes, Inc.*, 829 F. Supp.2d 1023, 1027 (W.D. Wash. 2011); *see
24    also Ridgel v. United States*, 2013 WL 2237884, at *2–3 (C.D. Cal. May 21, 2013); *Shuffle Master,
      Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210–11 (D. Nev. 2008) (collecting cases); *King
25    Tuna, Inc. v. Anova Food, Inc.*, 2009 WL 650732, at *1 (C.D. Cal. Mar. 10, 2009) ("It is well-settled
      that under Fed.R.Civ.P. 56(e), unsworn expert reports are not admissible to support or oppose
26    summary judgment" and that "to be competent summary judgment evidence, an expert report must
      be sworn to or otherwise verified, usually by a deposition or affidavit.").

27          [28] Doc. 175-3 at 31.

28          [29] Doc. 84 at 19 ¶ 51.

5

had rejected.[30]  Ideal's data providers collected data from thousands of third-party websites, most of which were unknown to Ideal.[31]  Ideal then imported that information into its consumer databases and automatically charged a fee (generally around $30) to the consumers' credit cards or debited their bank accounts.[32]  There is no evidence that Ideal charged these accounts with the account holders' authorization.[33]

For example, Ideal purchased hundreds of thousands of payday-loan applications from LeapLab, LLC and charged millions of dollars to these consumers' bank accounts during at least four charging campaigns.[34]  LeapLab's chairman and CEO, John Ayers, testified that Ideal's consumers could not have authorized Ideal's charges because LeapLab itself acquired the consumers' information from other data providers and networks of thousands of payday loan websites (collectively, the publishers)—the vast majority of which were unknown to even LeapLab.[35]  Ayers testified that for consumers to have authorized the charges Ideal made, the publishers would have been required to display disclosures about Ideal's products, which the publishers did not do.[36]

Many of Ideal's victims did not purchase Ideal's products or know of Ideal, its family of companies, or its products prior to discovering Ideal's charges on their statements.[37]  Consumers

---

[30] PX2 at ¶ 24; PX43 at 16:12–17:24; 20:8–19, 25:8–26:14, 32:16–33:4, 33:9–12, 35:5–16; PX43A at 1–5; PX44 at 10:7–11:22, 51:25–53:22.  The FTC submits its evidence with the preface "PX" to signify specific exhibits.  I use these prefaces when referring to the evidence the FTC offers in support of its motion.  These exhibits are contained in the docket in Documents 171–178.

[31] PX43 at 36:12–38:20; PX44 at 43:3–45:14, 46:10–15, 58:5–14.

[32] Doc. 14 at 12; PX37 at 224:6–14, 226–8–17; PX39 at 143:8–19, 247:22–248:1; PX40 at 141:6–144:17; PX44 at 25:2–26:17, 57:15–25; PX105 at ¶¶ 3–4.

[33] Doc. 14 at 10:1–3, 11:8-13, 12:10–11, 26–28, 14:22–27; PX1:D at 4–5; PX37 at 37:20–22, 60:18–61:15, 79:17–19, 126:17–18, 137:4–138:6, 144:1–4, 144:9–146:11, 152:17–22; PX37:A at 2; PX38 at 79:22–80:6, 142:3–12; 164:8–20, 165:13–166:1; PX38 at 46:24–47:6, 49:15–21, 52:6–11; PX39 at 127:10–19, 132:16–22, 145:7–21; 224:25–225:3.

[34] PX33 at 25; PX39 at 98:12–15; PX43 at 15:15–17, 17:5–9.

[35] PX43 at 35:2–7, 36:8–37:7, 38:2–39:10.

[36] PX43 at 35:21–38:20; PX44 at 57:19–25, 59:4–21, 62:15–63:2.

[37] PX7 at ¶¶ 6–7; PX8 at ¶¶ 13–14; PX9 at ¶¶ 3–5, 8; PX10 at ¶¶ 3, 5, 6; PX11 at ¶ 4; PX12 at ¶¶ 3, 10; PX13 at ¶ 4; PX14 at ¶¶ 2–3, 7; PX15 at ¶ 3; PX16 at ¶¶ 2–5; PX17 at ¶¶ 2–3; PX18 at ¶¶ 2, 5; PX19 at ¶ 3; PX20 at ¶¶ 3–5; PX21 at ¶¶ 3–4, 6; PX22 at ¶¶ 3–8; PX23 at ¶¶ 4–6; PX24 at

often complained to Ideal or its third-party call centers about unauthorized charges using customer-service phone numbers placed on their bank statements by the payment processors.[38]

Ideal's customer service agents were instructed to tell consumers that the consumers had authorized the charges to their accounts when applying for a payday loan online; the agents were unable, however, to tell the consumers on which website they provided that authorization or give them other proof of authorization.[39]  Customer-service agents followed scripts prepared by Michael and Chris Sunyich to respond to complaints and questions like "Why was I charged?" and "How did you get my information?"[40]  In an August 2011 email to the agents, Michael Sunyich explained that the consumers asked these questions because "YOU are the first time they are hearing about [our products]."[41]

According to Jared Mosher, Chris Sunyich, and Michael Sunyich, Ideal offered an online "member center" with financial calculators, a financial counseling and bill pay service, and loan-protection products,[42] although Shawn Sunyich confessed that these products were not actually available.[43]

Ideal's banks and processors routinely terminated its merchant accounts for high chargeback

---

¶¶ 3–7; PX25 at ¶¶ 5–7, 16; PX26 at ¶¶ 3–5; PX28 at ¶¶ 2–4; PX29 at ¶¶ 3, 9; PX30 at ¶¶ 8–9; PX31 at ¶¶ 3–4.

[38] Doc. 84 at 14, ¶¶ 45-46;  PX1 at ¶¶ 122–123; PX7 at ¶ 7; PX8 at ¶¶ 13–14; PX9 at ¶ 6; PX10 at ¶ 5; PX13 at ¶ 5; PX14 at ¶¶ 5, 7; PX15 at ¶¶ 4–6; PX16 at ¶ 5; PX18 at ¶¶ 5–6; PX19 at ¶¶ 3–4; PX20 at ¶¶ 5–7, 12; PX21 at ¶¶ 3–5; PX23 at ¶ 5; PX24 at ¶ 8; PX25 at ¶¶ 4, 9, 17; PX26 at ¶ 5; PX37 at 40:10-21.

[39] PX1 at ¶¶ 116–118; PX7 at ¶¶ 4, 6, 8; PX8 at ¶ 26; PX9 at ¶ 6; PX10 at ¶ 5; PX15 at ¶ 4; PX16 at ¶ 5; PX20 at ¶¶ 7, 12; PX20:D at 2; PX23 at ¶ 5; PX24 at ¶ 8; PX25 at ¶ 10; PX26 at ¶ 27; PX29 at ¶¶ 5–6, 11; PX30 at ¶ 7; PX38 at 96:18–97:9; PX40 at 66:3–16.

[40] PX2 at ¶¶ 8-11; PX2:D at 1–2; PX2:E at 2; PX39 at 235:11–236:12; PX39:A at 9.

[41] PX40 at 92:12-21; PX40:A at 1-2.

[42] PX8 at ¶ 8; PX37 at 24:7–13,157:16–19, 182:23–183:2, 184:22-24, 226:18–227:14; PX39 at 45:9–45:20, 108:8–19, 222:17-19; PX40 at 117:1–3. PX44 at 18:11–18.

[43] PX2 at ¶ 27.

7

and return rates.[44]  Ideal itself calculated that, in the second quarter of 2010, its chargebacks and refunds made up at least 25.5% of its total revenue and trended upwards.[45]  Documents obtained by the FTC from one of Ideal's processors, as well as other processor reports found among Ideal's files, show that return rates from various campaigns during 2010 and 2011 were above 50%.[46]  By May 2010, processors had shut down more than 20 of Ideal's merchant accounts.[47]  In 2011, a processor terminated several other accounts belonging to Ideal.[48]  By May 2012, the Ideal organization lost four more accounts.[49]  In September 2012, Ideal's CFO and General Counsel, Scott Manson, candidly admitted in an email to Kent Brown, "I would be surprised if [the merchant accounts] lasted more than a month.  Using crappy data to charge people for a service they do not want.  I am always amazed that the returns are not 100%."[50]

Ideal's billing records indicate that it attempted to take tens of millions of dollars from more than a million consumers between January 2009 and January 2013.[51]  Chargebacks and refunds resulted in the return of only a portion of this amount to consumers.[52]  Consumers suffered additional harm in the form of insufficient funds fees and other bank assessments caused by the unexpected charges, unpaid refunds, and the general nuisance of contesting the charges.[53]

---

[44] PX38 at 82:4–14, 85:1-14, 86:5–15; PX41 at 45:15–22, 91:17–23; PX41:A at 1-3; PX60 at 1.

[45] PX1 at ¶ 16; PX1:D at 71.

[46] PX1 at ¶¶ 154, 156-158, 166; PX1:HH at 5, PX1:XX at 4.

[47] PX38 at 188:11-190:2; PX38:A at 24–26.

[48] PX1 at ¶¶ 163-166, 169; PX1:HH; PX1:ZZ at 1, 6.

[49] PX80 at¶ 7; PX80:E.

[50] PX80 at ¶ 7; PX80:F; PX105 at ¶ 8.

[51] See PX33 at ¶¶ 22, 23(d).

[52] See PX33 at ¶¶ 22, 23(d).  See PX7 at ¶ 10; PX19 at ¶ 3; PX21 at ¶ 6; PX26 at ¶ 22; PX27 at ¶¶ 8-9, 14; PX31 at ¶ 7; PX37 at 229:22-230:19; PX40 at 53:20-54:4.

[53] PX7 at ¶ 10; PX11 at ¶ 10; PX12 at ¶¶ 10, 13; PX13 at ¶¶ 7, 9; PX14 at ¶¶ 4, 7; PX16 at ¶ 10; PX19 at ¶¶ 3, 7; PX20 at ¶ 24; PX21 at ¶ 6; PX23 at ¶ 7; PX25 at ¶¶ 5–7, 15, 16; PX26 at ¶ 22; PX27 at ¶¶ 8–9, 14; PX28 at ¶ 5; PX29 at ¶ 10; PX30 at ¶¶ 5, 10; PX31 at ¶ 7; PX37 at 229:22–230:19; PX39 at 157:9–19, 162:12–22; PX40 at 53:20–54:4.

1       Prior to 2010, Ideal processed charges through Ideal FSI merchant accounts.[54]  Beginning in

2   2010, Ideal used its other shell companies to purchase consumers' account data and charge their

3   accounts.[55]  After purchasing the account numbers, Ideal batched them, assigned each batch to a shell

4   and merchant account, and directed a payment processor to charge that account.[56]  Ideal recorded

5   consumer data, the batching, and information about the charges in its consumer databases.[57]  Ideal

6   recruited its employees or their friends or relatives to serve as the shells' straw officers; they then

7   filed formation documents, registered DBAs, and opened merchant and bank accounts for the

8   shells.[58]  In addition, Ideal assigned each a mailing address (typically a virtual office address shared

9   with the other shells) and email address, both of which forwarded to Ideal FSI's employees.[59]  Ideal

10  also created websites for the shells, acquired phone numbers, and hired a third-party call center to

11  respond to consumer complaints.[60]  Ideal's customer service agents often used the DBA

12  "Membership Care" to respond to consumer complaints and followed the same customer service

13  scripts.[61]  Ideal also opened dozens of bank accounts for the shells, with Ideal FSI's officers and

14  employees as signatories.[62]  It also funneled the proceeds from charging campaigns to accounts in the

15

16

---

17      [54] PX1 at ¶¶ 16, 23, 147; PX1:D at 5; PX1:UU.

18      [55] See, e.g., Doc. 14 at 12:21–13:3-5; PX1 at ¶¶ 92, 112; PX1:DD; PX1:NN at 1; PX44 at
19  31:22-34:9.  PX43 at 278, 27:18–21; PX38:A at 32-33; PX80 at ¶ 7; PX80M; PX105 at ¶¶ 3–4.

20      [56] See PX1:HH at 5–6.

21      [57] PX33 at ¶¶ 5–8; PX37 at 196:13–14; PX38 at 50:7–12; PX44 at 25:2–27:8.

22      [58] PX44 at 33:6–37:19; PX41 at 31:12–34:9, 35:9-15, 43:5–44:7, 44:17–19,122:16–25,
    192:12–15; PX40 at 36:25–37:16; Doc. 84 at 24, ¶¶ 9–10; Doc. 84 at 26, 11; Doc. 84 at 28, ¶¶
23  10-11; Doc. 84 at 31, ¶¶ 5–6, 11; PX80 at ¶ 7; PX80:A; PX80:B.

24      [59] PX1 at ¶¶ 18, 24, 30, 87; PX1:E at 1–2; PX1:J; PX1:Z; PX6 at ¶ 6; PX6:C; PX80:H at 1–2;
    PX80 at ¶ 7.

25      [60] Doc. 84 at 18, ¶¶ 41, 46; PX1 at ¶¶ 18, 84, 90, 109, 111-115; PX1:CC, KK-PP; PX7 at ¶¶
26  3-7; PX37 at 40:16–17; PX40 at 76:23–77:20, 126:9–11; PX44 at 13:2–9, 16:1–4, 18:11-18.

27      [61] PX8 at ¶ 16. PX12; PX17; PX40 at 62:23–63:2, 63:7–22, 125:1–126:8, 126:12–20; PX41
    at 70:5–10.

28      [62] PX2 ¶ 20; PX2:I; PX80 at ¶ 7; PX80:B PX80:K.

names of various shells.[63]  Ideal at times created multiple shells, opened related bank accounts, and registered batches of DBAs within a few days' time.[64]

### 2.     *Ideal FSI: The Operational Center of the Business*

Defendant Ideal FSI, a public company, was the operational center of the organization.[65] Steven Sunyich, his son Chris Sunyich, and Jared Mosher had ultimate authority over Ideal FSI and the Ideal common enterprise.[66]  Kent Brown managed the accounting and merchant accounts and oversaw other day-to-day operations.[67]  Michael Sunyich and Shawn Sunyich oversaw customer service and business development.[68]  Rob Dahl and Paul Currie served as Ideal FSI's directors, but they also served as signers for certain shells.[69]  Ideal FSI leased office space in St. George, but it frequently used a Las Vegas virtual address on business filings.[70]  At least fourteen of the shells are wholly owned subsidiaries of Ideal FSI.[71]

At the St. George office, a small group of employees managed administrative and accounting functions for the shells.[72]  Toni LeMond and Sharon Martin kept track of shell company names,

---

[63] PX2 at ¶¶ 18-19; PX2:H at 9–11; PX1 at ¶ 43; PX80 at ¶ 7; PX80:I; PX80:J; PX80:O–R.

[64] PX1 at ¶¶ 11, 13, 14, 70, 74, 76, 55, 103, 163–66; PX1:A at 13, 25, 31; PX1:B at 1–3, 14–18, 21, 27; PX1:M at 1, 3, 5, 7, 9, 11, 32-39, 71–75; PX1:P; PX1:R–S; PX1:HH at 1–5.

[65] *See* PX1 at ¶ 16; PX1:D at 2, 40, 42, 65; PX8 at ¶¶ 4–11; PX37 at 94:14–21, 181:22–24; PX38:A at 11–13 (Dep. Ex. 41); PX41 at 131:2–9.

[66] Doc. 14 at 9:24–25, 10:23–24, 13:3–7, 13:22–23; PX2 at ¶ 15; PX2:G; PX3 at ¶ 6; PX3:A; PX3:B; PX40 at 37:7–9; 61:10–17, 67:1–5, 136:15–16; PX44 at 30:14–31:21, 39:7–40:4; PX105 at ¶¶ 3-4.

[67] Doc. 14 at 13:19-20, 13:24–27; PX3 at ¶ 6; PX3:A; PX3:B; PX37 at 179:14–21; PX40 at 37:10–11; PX41 at 64:17-22; PX44 at 15:19–25, 20:11–14, 39:18–22; PX80 at ¶ 7; PX80:B; PX105 at ¶¶ 3–4.

[68] Doc. 14 at 12:6–7, 12:18-20; PX1 at ¶ 25; PX1:F at 5–6; PX8 at ¶ 8; PX38 at 136:10–14, 145:6–13; PX39 at 100:25–101:5; PX37 at 72:23–25; PX40 at 13:20–24; PX40:A at 1; 8-9; PX105 at ¶¶ 3–4.

[69] Doc. 84 at 26, ¶¶ 10–11, 28–29 at ¶¶ 10-11; PX1 at ¶¶ 13, 15–16; PX1:A at 61–62; PX1:C at 1, PX1:D at 42–43, 46.

[70] PX1at ¶ 30; PX1:J.

[71] Doc. 41 at 1; Doc. 84 at 5, ¶ 16; PX1 at ¶¶ 16, 22–23; PX1:D at 40; PX41 at 148:11–149:3.

[72] Doc. 14 at 2:16–3:7; PX2 at ¶ 4; PX105 at ¶¶ 3–4.

1    DBAs, merchant accounts, and addresses as well as refunds for complaining consumers.[73]  Brown

2    managed merchant and bank accounts.[74]  Terri Bunker assisted Brown with accounting.[75]  Brian

3    Jensen set up domain names and websites for shell companies.[76]  Brian Godfrey managed Ideal's

4    consumer database, processed refunds, and carried out the individual defendants' instructions for

5    how to split up consumer lists and submit information to payment processors.[77]  Michael Betts

6    provided day-to-day management of Ideal's customer service.[78]  Josh Rodgers headed "reputation

7    management," including responding to written complaints from consumers and the Better Business

8    Bureau.[79]

9        **3.    Individual Defendants**

10           **a.    Steven Sunyich**

11           Defendant Steven Sunyich was Ideal FSI's CEO from 2004 to 2013.[80]  He also served as the

12   registered agent for at least two shells: Newline Cash, LLC and Funding Guarantee, LLC.[81]  Steven

13   recruited straw officers for shell companies and arranged the purchase of consumers' account

14   information from data providers.[82]  Additionally, Steven controlled Ideal's finances as a signatory on

15   many of the scheme's bank accounts.[83]  Steven admitted to knowing about Ideal's unauthorized

16

---

17       [73] PX40 at 57:24–58:10; PX41 at 64:13–22; 115:16–20; 125:9–15; PX80 at ¶ 7; PX80:H.

18       [74] PX44 at 39:18–22; PX80 at ¶ 7; PX80:B.

19       [75] Doc. 84 at 31, ¶¶ 5–9; PX42 at 36:25–37:8.

20       [76] PX44 at 13:2–20, 15:19–20:16.

21       [77] PX37 at 225:1–8; PX38 at 44:9–19; PX40 at 58:24–59:25; 61:10–13.

22       [78] PX37 at 72:23–25, 181:10–11; PX38 at 145:6–13; PX39 at 100:19–101:5.

23       [79] PX37 at 181:21–22; PX39 at 99:5–7, 238:1–10.

24       [80] Doc. 84 at ¶ 5; PX1 at ¶ 54; PX1:A at 6; PX1:D at 42; PX38 at 34:4–9; PX39 at 42:2–4.

25       [81] PX1 at ¶¶ 77–78, PX1:T at 1; PX1:U at 1; PX41:A at 14.

26       [82] PX38 at 77:8–14; PX39 at 44:8–18, 45:2–46:3; PX41 at 31:19–34:15, 35:16–19; PX44 at
27   30:14–31:1, 31:10–13, 34:12–21, 39:7–40:4.  *See* Doc. 84 at 24–35.

28       [83] PX1 at ¶ 16, 55; PX1:D at 46; PX1:M at 1–27, 37–42, 51–52, 54–63, 66–67, 77–78; Doc.
     84 at 7, ¶ 28.

1   charges and received regular reports of Ideal's return and chargeback rates that topped 50 percent.[84]

2   He knew that payment processors repeatedly shut down Ideal's merchant accounts because of the

3   high rates[85] and that, because of Ideal's high return rates, processors placed Chris Sunyich on a

4   terminated merchant list, i.e., a blacklist maintained by processors and banks.[86]  In addition, Steven

5   received regular reports from Ideal's third-party call centers about the high volume of complaint calls

6   and knew that consumers were complaining about Ideal to their banks and processors.[87]  He knew

7   that Ideal's customer-service agents told complaining consumers that the consumers had authorized

8   the charges.[88]  Steven discussed Ideal's return rates, complaint calls, and high number of refunds

9   with Chris Sunyich and other Ideal employees.[89]  Additionally, Steven knew of Ideal's problems with

10  law enforcement and drafted a letter to the Utah Division of Consumer Protection for Avanix.[90]

11  Although Steven blames Mosher for Ideal's unlawful charging campaigns, he admits that, even prior

12  to Mosher's arrival, Ideal experienced terminated merchant accounts and consumer complaints and

13  engaged in blind billing.[91]  When Steven hired Mosher, he believed that Mosher was running an

14  illegal business but hired him because "Jared was making a boat load of money as a broker."[92]

15              ***b.***     ***Chris Sunyich***

16          Chris Sunyich is Steven's son, was President of Ideal FSI from 2009 to 2013, and was a

17

18

_____

19      [84] Doc. 14 at 10:1–37; PX38 at 79:22–80:20, 92:14–17, 142:13–25,163:9–164:17,
165:13–166:1; PX38:A at 19; PX39 at 70:16–71:11; PX44 at 28:14–17; PX105 ¶¶ 3–4.

20      [85] PX38 at 81:21–25, 82:13–14, 85:1–14.

21
        [86] PX38 at 86:5–23; 160:15–24; 161:22-162:20; PX38:A at 5.

22      [87] PX2 at ¶ 19; PX2:H at 8; PX38 at 92:14–17, 93:14–94:21, 145:14–19; PX38:A at 16;
23  PX39 at 70:16–71:11; PX44 at 28:14–17.

24      [88] PX38 at 96:9–97:20.

25      [89] PX38 at 93:18–94:12, 138:3–7; PX44 at 37:20–39:20.

26      [90] PX38 at 95:19–96:1–8.

27      [91] Doc. 14 at 10 at 1–3; Doc. 84 at 20–22, ¶ 59; PX38 at 82:4–14, 163:9–164:20,
188:8–190:4; PX38:A at 19; PX105 at ¶¶ 3–4.

28
        [92] PX38 at 147:5–48:8, 178:2–179:25; PX38:A at 8.

signer for the shell entity Debt Eliminations Systems, LLC.[93]  Along with his father, Chris controlled

and participated in many aspects of the Ideal operation.[94]  He recruited signers and straw officers for

the shell companies, managed relationships with Ideal's data providers, signed for merchant

accounts, and directed how Ideal submitted consumer data to processors.[95]  Chris controlled Ideal's

finances as a signatory on several bank accounts,[96] and he had a once-weekly call with Ideal's

customer service personnel, drafted customer service scripts, and managed Ideal's relationship with

its third-party call center, Focus.[97]

Chris did "not doubt" that Ideal made unauthorized charges.[98]  He received regular reports

from Mosher detailing the number of charges consumers reported as unauthorized.[99]  A processor put

him on a terminated merchant list because of Ideal's excessive chargebacks.[100]  He also received

reports of complaint calls from Focus, drafted customer service scripts, and participated in weekly

calls with Focus to discuss customer service calls.[101]  He knew of the "bad trends" in customer

service—by which he meant consumers who reported not authorizing a charge.[102]  Finally, he

discussed Ideal's return rates, complaint calls, and high number of refunds with his father and other

---

[93] Doc. 14 at 10:23–24; Doc. 41 at ¶ 6; Doc. 84 at 3, ¶ 7; PX1 at ¶¶ 60, 147; PX1:D at 16, 42, 44; PX1:UU; PX37 at 46:2–5, 51:21–52:10; PX38 at 86:19–21, 112:16–22; PX41 at 46:7–9; PX105 at ¶¶ 3–4. *See also* Doc. 40-1 at 2.

[94] Doc. 14 at 10:23–24, 13:21–23; PX40 at 19:25–20:5, 37:7-12, 136:12-16, 178:2–6, 205:2–19; PX41 at 76:12–21, 180:7–21; PX44 at 15:19–25, 31:10–21, 39:7–14; PX105 (Robertson Decl.) ¶¶ 3–4.

[95] PX1 at ¶ 147; PX1:UU; PX37 at 99:21–100:2, 192:22–193:17; PX38 at 86:19–21; PX39 at 94:12–20; PX39:A at 5; PX41 at 180:7–21; PX44 at 20:6–16; 30:14–19, 31:10–13; 39:7–40:9.

[96] Doc. 84 at 7, ¶ 28; PX1 at ¶¶ 55, 61; PX1:M at 1–27, 37–42, 49–52, 56–57, 60–63, 66–67, 77–78; PX40 at 72:17–20.

[97] PX37 at 72:1–73:25, 244:5–12; PX40 at 87:19–22; PX41 at 61:9–15, 62:1–4.

[98] Doc. 14 at 11:7–13; PX37 at 45:9–22; PX105 at ¶¶ 3–4.

[99] PX37 at 199:1–14; 221:15–23; PX39 70:16–71:11.

[100] PX37 at 135:6–9, 14–17.

[101] PX37 at 71:16–73:25; PX40 at 87:19–22.

[102] PX37 at 70:18–24, 71:7–18, 74:22–25.

13

1  Ideal employees.[103]

2          **c.**    ***Jared Mosher***

3      In late 2010, Steven and Chris Sunyich recruited Mosher to help run the business "because of

4  his expertise and understanding of the [payday-loan] industry."[104]  Together, Mosher and the

5  Sunyiches directed Ideal's scheme from late 2010 through mid-2012.[105]  As President of Ascot

6  Crossing, LLC (a company used to front merchant accounts and process transactions) and de facto

7  officer of Ideal FSI, Mosher had significant authority over the Ideal scheme.[106]  Mosher also oversaw

8  Bracknell Shore, LLC (which Ideal used as its customer service front during its charging campaigns)

9  during that time.[107]  He recruited signers and straw officers for shell companies, decided when Ideal

10  applied for merchant accounts, determined Ideal's refund policy, reviewed customer-service scripts,

11  and scripted what customer service agents said to complaining consumers.[108]  Mosher also negotiated

12  the fees that Ideal paid payment processors, data providers, and Focus;[109] and, along with Brown, he

13  managed the accounting and had final approval over bank transfers.[110]

14      Mosher knew that Ideal charged consumers without authorization.[111]  He was also aware

---

[103] PX37 at 43:15–22; PX38 at 94:9–12, 138:3–7; PX44 at 38:12–25.

[104] PX38 at 54:4–7; 147:5–148:8; PX38:A at 8; PX39 at 22:2–25, 34:11–14, 41:3–42:14, 49:14–22.

[105] Doc. 14 at 4:17–19, 13:21–23; PX105 at ¶¶ 3–4.

[106] Doc. 14 at 4:17–19, 10:10–12, 12:6-8, 13:21-23, 15:18–20, 16:2–3; Doc. 84 at 15, ¶ 14; PX1 at ¶¶ 14, 41–44, 80, 92; PX1:W at 3; PX2 at ¶ 15; PX2:G at 1, 3; PX3 at ¶¶ 3, 10–11; PX3:B at 1; PX3:I at 2; PX3:J; PX37 at 179:10–11; PX38 at 70:8–11; PX39 at 260:14–20; 73:18–22.

[107] Doc. 84 at 15, ¶ 14; PX1 at ¶¶ 23, 31.

[108] Doc. 84 at 16, 18–19, ¶¶ 23, 47; Doc. 84 at 24–25, ¶¶ 4–13; Doc. 84 at 26–27,¶¶ 4-11; Doc. 84 at 28–29, ¶¶ 5-12; Doc. 84 at 30, ¶¶ 5-8; PX3 at ¶ 7; PX3:C–F; PX39 at 169:11–170:13; 226:18–228:16; 235:11–236–9; PX39:A at 7–10; PX40 at 63:7–14, 66:10–13; 67:1–5.

[109] PX39 at 64:20–23, 66:12–13, 94:12–15, 240:17–19, 287:11–14.

[110] PX1 at ¶¶ 55, 80; PX1:M at 21–24; Doc. 84 at 31, ¶¶ 8–9; Doc. 84 at 24, ¶ 10; Doc. 84 at 7, ¶ 28; PX39 at 287:13–14, 63:6–11.  *See* Doc. 84 at 24–35.

[111] Doc. 14 at 14:22–27; PX105 at ¶¶ 3–4.

1   when processors terminated Ideal's merchant accounts for high chargeback and return rates.[112]  He

2   created daily reports for Ideal's officers of the various campaigns' return rates.[113]  He also knew that

3   consumers complained of unauthorized charges and "extremely high" percentage demanded

4   refunds.[114]  He did nothing, however, to stop the unauthorized charges, claiming that it "wasn't [his]

5   job to sit there and think about" why consumers complained.[115]

6                    **d.    *Melissa Sunyich Gardner***

7            Melissa Sunyich Gardner was an officer of Ascot.[116]  From June 2009 to June 2012, she

8   submitted more than 20 merchant applications on behalf of the shells.[117]  She also signed corporate

9   documents as an officer and communicated with a payment processor about merchant applications

10  on Ideal's behalf.[118]  Melissa claims that she did not want to engage in Ideal's daily business and,

11  thus, did not want to ask too many questions about company matters.[119]  Nonetheless, she understood

12  that Ideal needed shells and signers to open new merchant accounts.[120]  She admitted that she signed

13  necessary merchant account applications and corporate filings even if they contained false

14  information.[121]  Melissa knew that processors routinely terminated Ideal's merchant account

15  applications for high chargeback and return rates.[122]  She also knew of consumer complaints.[123]  She

16  ────────────────

17          [112] PX39 at 195:20–196:18.

18          [113] PX39 at 70:9–71:11.

19          [114] PX39 at 241:8-17.

20          [115] Doc. 14 at 15:2–5; PX39 at 229:7–8, 230:3–8; 279:23–280:15.

21          [116] Doc. 41 at 3, ¶ 8; PX1 at ¶ 13, 65; PX1:A at 26–28.

22          [117] PX41 at 122:16–25, 131:21–25; 150:25–152:8, 155:5–25, 163:7–164:23, 165:1–166:2,
        170:6–171:21, 171:24–175:16; PX41:A at 16–69.

23          [118] PX1 at ¶ 13, 40; PX1:A at 26–28; PX41 at 53:3–54:21.

24          [119] PX41 at 74:3–5.

25          [120] PX41 at 31:19–32:12, 33:15-18, 35:5–8, 34:6–9, 37:7–12; 38:7–11.

26          [121] PX41 at 37:13–38:21, 39:18–42:22; 123:2–125:24.

27          [122] PX41 at 45:12–22; 177:23–179:13; PX41:A at 72–73.

28          [123] PX41 at 60:19–61:15 73:1–12; 74:9–12, 75:25–76:8.

1    discussed Ideal's chargebacks and consumer complaints with other individual defendants.[124]   Melissa

2    stated that Ideal's corporate priorities were avoiding chargebacks and resolving complaints so that

3    merchant accounts would not be shut down.[125]

4            *e.    Michael Sunyich*

5            From 2009 to 2012, Michael Sunyich was FSI's Vice President for Customer Retention, its

6    call center manager, and President of Bracknell.[126]   As an officer, he registered Ideal DBAs,

7    including Debt to Wealth and Cash Savers.[127]   Michael also managed Ideal's customer service

8    operations—including its relationship with Focus—for a two-month period.[128]   He monitored agents'

9    calls with complaining consumers, evaluated their performance, and determined which agents

10   deserved commissions.[129]   He received periodic reports detailing the number of consumers

11   requesting refunds.[130]   In June 2012, when speaking to Utah law enforcement with Brown, Michael

12   disavowed any knowledge of Avanix, even though he himself managed aspects of the Avanix

13   campaign by setting up a mail drop for Avanix that only he, Brown, and another Ideal employee

14   could access.[131]

15           Michael knew that consumers complained that they had not authorized Ideal's charges to

16   their accounts.[132]   In 2011 he told his call-center staff not to offer refunds to consumers complaining

17

18

---

19           [124] PX41 at 179:4-13.

20           [125] PX41 at 74:13-16, 179:4-12.

21           [126] PX1 at ¶ 57; PX1:A at 13-14; PX1:F at 5-6; PX40 at 79:12-81:16, 92:12-93:6; PX40:A at

22   1, 8.

23           [127] PX1:B at 4, 25.

24           [128] PX37 at 244:5-12; PX38 at 47:21-48:3; PX39 at 100:25-102:5; PX40 at 54:15-55:8,
     56:21-24.

25           [129] PX40 at 64:18-65:8, 203:21-204:14; 92:12-94:5; PX40:A at 1.

26           [130] PX40 at 57:7-58:3, 182:9-10, 183:15-23; PX40:A at 15.

27           [131] PX6 at ¶¶ 5-10, 12-13; PX6:C.

28           [132] PX40 at 63:23-64:20, 65:15-19, 117:9-12; 163:15-17.

about unauthorized charges.[133]  Additionally, he knew about law enforcement investigations into the Ideal organization's unauthorized charges.[134]  Michael spoke with Brown and Steven Sunyich about the complaints.[135]

## III.   Discussion

### A.   The FTC Has Sustained its Burden to Show that the Evidence Supports the Entry of Summary Judgment on the Remaining Individual Defendants' Liability for Violations of Section 5 of the FTC Act Based on Unfair Billing Practices, Deceptive Billing, and Deceptive Statements.

The FTC alleges three counts against the defendants for violations of Section 5 of the FTC Act, which prohibits "unfair . . . acts or practices in or affecting commerce."[136]  The FTC proves liability for an unfair trade practice when "the act or practice causes or is likely to cause substantial injury to consumers [that] is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."[137]  "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers were aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact."[138]  A deceptive practice may be inferred from the presence of "high cancellation, refund, and chargeback rates."[139]

### 1.   Count I: unauthorized charges

In Count I, the FTC alleges that the defendants violated the Act with unauthorized charges to

---

[133] PX40 at 92:12–94:5; PX40:A at 1.

[134] PX6 at ¶¶ 7–10, 12–13.

[135] PX40 at 160:23–161:7, 163:18–168:12.

[136] 15 U.S.C. § 45(a); Doc. 32.

[137] 15 U.S.C. § 45(n); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).

[138] *Davis*, 691 F.3d at 1168–69 (quoting *Orkin Exterminating Co, Inc. v. F.T.C.*, 849 F.2d 1354, 1365–66 (11th Cir. 1988)).

[139] *F.T.C. v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1221 (D. Nev. 2011), *vacated in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014).

1  consumer credit cards and bank accounts.  Courts regularly find unauthorized billing to be unfair.[140]

2  And taking consumers' funds without authorization causes substantial injury, even when the amount

3  taken is relatively small.[141]

4          The evidence in the record demonstrates that the defendants engaged in unfair billing

5  practices not outweighed by countervailing benefits to consumers or competition.  The unauthorized

6  charges against unwitting consumers' bank accounts and credit cards were plainly substantial; the

7  evidence reflects tens of millions of dollars were charged to more than a million customers from

8  2009-2013.[142]  And the injury was not avoidable by the consumers; they only learned of the

9  unwanted charges after their money had been extracted from their accounts.  Finally, the consumers'

10  ability to "pursu[e] potential avenues toward mitigating the injury" was obstructed by Ideal's

11  customer service staff, who were instructed to push the financial services that the consumers had

12  "purchased" and avoid refunds or chargebacks.[143]  As the stack of declarations submitted by

13  aggrieved consumers and the customer-service representatives who fielded the calls from irate

14  callers demonstrate, many consumers who requested a refund never received one, and those who did

15  suffered other financial injury like overdraft fees and bounced-check fees.[144]  The evidence

16  overwhelmingly establishes that the Corporate Defendants violated the Act based on unauthorized

17  charges as alleged in Count I.

18          **2.      *Counts II & III: false billing and material misrepresentations***

19          In its second and third counts, the FTC alleges that the defendants violated the Act by

20

21          [140] *FTC v. Inc21.com*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010); *FTC v. J.K.*
22  *Publications*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000).

23          [141] *J.K. Publ'ns*, 99 F. Supp.2d at 1201; *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir.
    1994).

24          [142] *See* PX33 at ¶¶ 22, 23(d).

25          [143] *See, e.g.,* PX7.

26          [144] PX7 at ¶¶ 6–7; PX8 at ¶¶ 13-14; PX9 at ¶¶ 3-5, 8; PX10 at ¶¶ 3, 5, 6; PX11 at ¶ 4; PX12
27  at ¶¶ 3, 10; PX13 at ¶ 4; PX14 at ¶¶ 2–3, 7; PX15 at ¶ 3; PX16 at ¶¶ 2–5; PX17 at ¶¶ 2–3; PX18 at
    ¶¶ 2, 5; PX19 at ¶ 3; PX20 at ¶¶ 3–5; PX21 at ¶¶ 3–4, 6; PX22 at ¶¶ 3–8; PX23 at ¶¶ 4–6; PX24 at
28  ¶¶ 3–7; PX25 at ¶¶ 5–7, 16; PX26 at ¶¶ 3–5; PX28 at ¶¶ 2–4; PX29 at ¶¶ 3, 9; PX30 at ¶¶ 8–9; PX31
    at ¶¶ 3–4.

1   material misrepresentations.[145]  A representation or omission violates the Act if it "(1) . . . is likely to

2   mislead consumers acting reasonably under the circumstances (2) in a way that is material."[146]  "To

3   determine whether a representation, omission, or practice is likely to mislead, the Court considers the

4   overall net impression the representation creates."[147]

5        The evidence overwhelmingly shows that the defendants, through a common scheme to

6   defraud, made false and material representations designed to mislead the victims.  Victims had their

7   bank accounts and credit cards charged without their knowledge or consent, and when they called to

8   question the charges and have them reversed, customer service representatives—on defendants'

9   instructions or with their full knowledge and intent—falsely told the callers that they had authorized

10  the charges.  They also told the callers that the credit was being processed, which—many

11  times—was entirely untrue.[148]  These representations were plainly part of a system of deceptive

12  statements on which the defendants collectively intended the victims to rely.  And that reliance was

13  material because it led to a debit from the consumers' bank accounts or credit card accounts.  The

14  FTC has satisfied its burden to demonstrate that the Corporate Defendants violated Section 5 of the

15  Act based on false billing and material misrepresentations as alleged in Counts II and III.

16            **3.    *Individual liability***

17       The evidence also overwhelmingly demonstrates that Steven Sunyich, Chris Sunyich,

18  Michael Sunyich, Melissa Sunyich Gardner, and Jared Mosher bear individual liability for the

19  violations.  The Ninth Circuit test for individual liability for injunctive and monetary relief under the

20  Act depends in part on a determination of corporate liability.[149]  Here, the lines between the

21  ────────────────

22        [145] Doc. 32 at 19.

23        [146] *F.T.C. v. Cyberspace.com*, 453 F.3d 1196, 1199 (9th Cir. 2006).

24        [147] *F.T.C. v. Publishers Business Services*, 821 F. Supp. 2d 1205, 1223 (D. Nev. 2010) (citing
    *Cyberspace.com*, 453 F.3d at 1200).

25        [148] PX7 at ¶¶ 6–7; PX8 at ¶¶ 13–14; PX9 at ¶¶ 3–5, 8; PX10 at ¶¶ 3, 5, 6; PX11 at ¶ 4; PX12
26  at ¶¶ 3, 10; PX13 at ¶ 4; PX14 at ¶¶ 2–3, 7; PX15 at ¶ 3; PX16 at ¶¶ 2–5; PX17 at ¶¶ 2–3; PX18 at
    ¶¶ 2, 5; PX19 at ¶ 3; PX20 at ¶¶ 3–5; PX21 at ¶¶ 3–4, 6; PX22 at ¶¶ 3–8; PX23 at ¶¶ 4–6; PX24 at
27  ¶¶ 3–7; PX25 at ¶¶ 5–7, 16; PX26 at ¶¶ 3–5; PX28 at ¶¶ 2–4; PX29 at ¶¶ 3, 9; PX30 at ¶¶ 8–9; PX31
    at ¶¶ 3–4.

28        [149] *See Stefanchick*, 559 F.3d at 931.

1   Corporate Defendants, which were all controlled by these individual defendants, were blurred to the

2   point where they can only be considered a common enterprise.[150]

3                         *a.       Common enterprise*

4       "Where corporate entities operate together as a common enterprise, each may be held liable

5   for the deceptive acts and practices of the others."[151]  "[E]ntities constitute a common enterprise

6   when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by

7   a showing of strongly interdependent economic interests or the pooling of assets and revenues."[152]

8   Courts evaluate a number of factors when determining whether the schemes in question constitute a

9   common enterprise, including: "common control, sharing of office space and officers, whether

10  business is transacted through a 'maze of interrelated companies,' the commingling of corporate

11  funds, unified advertising, and any other evidence revealing that no real distinction existed between

12  the corporate defendants."[153]  Additionally, an individual who controls an entity found to participate

13  in a common enterprise is also liable for the joint deceptive acts and practices.[154]

14      At a minimum, the undisputed material facts establish a common enterprise between Ideal,

15  Ascot, and Bracknell—which individual defendants Steven, Chris, and Michael Sunyich, Melissa

16  Sunyich Gardner, and Jared Mosher controlled.  For example, the admissible evidence shows that

17  Ideal formed Ascot Crossing, LLC, as a wholly owned subsidiary of Ideal FSI, and that Ascot shared

18  an office with Ideal FSI and Bracknell.[155]  Jared Mosher was President, and Melissa Gardner was an

19

20

21

22  ────────────
        [150] *See FTC v. Network Servs. Depot Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010) (finding a
    common enterprise where corporate defendants pooled resources, staff, and funds, were controlled

23  by the same individuals, and participated in the same deceptive acts).

24      [151] *Grant Connect, LLC*, 763 F.3d at 1105 (citation omitted).

25      [152] *Network Services Depot, Inc.*, 617 F.3d at 1142–43.

26      [153] *F.T.C. v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008) (citations omitted).

27      [154] *See id.*

28      [155] PX1 at ¶¶ 23, 35, 45; PX1:D at 36-38; PX37 at 168:8-171:5; PX40 at 127:18-128:10; Doc.
    84 at 19, ¶ 51.

1  officer and signer of Ascot.[156]  Mosher oversaw the activities of both Ascot and Bracknell.[157]  Ideal

2  used Ascot to front merchant accounts and process charges.[158]  For example, defendants charged

3  consumer accounts $394,000 through an Ascot merchant account with Landmark Clearing for the

4  billing campaign Debt2Wealth.[159]  Processors terminated numerous Ascot merchant accounts for

5  high chargeback rates.[160]  In addition, Ideal used more than ten Ascot bank accounts to pay Ideal's

6  data providers, payroll, consumer refunds, and other bills.[161]  Ideal also temporarily placed other

7  shells' revenues in Ascot accounts before transferring to different Ideal accounts.[162]  These facts

8  demonstrate a common enterprise between Ideal, Ascott, and Bracknell.

9           *b.      Individual control of the common-enterprise entities*

10          "An individual is personally liable for a corporation's FTC Act § 5 violations if he

11  'participated directly in the acts or practices or had authority to control them' and 'had actual

12  knowledge of material misrepresentations, was recklessly indifferent to the truth or falsity of a

13  misrepresentation, or had an awareness of a high probability of fraud along with an intentional

14  avoidance of the truth.'"[163]  Knowledge is satisfied where, *inter alia*, an individual "had an

15  awareness of a high probability of fraud along with an intentional avoidance of the truth."[164]

16          There is no genuine dispute that Steven Sunyich, Chris Sunyich, Michael Sunyich, Melissa

17

18          [156] Doc. 84 at 4–5, ¶¶ 11, 14; Doc. 84 at 14–15; PX3 at ¶ 11; PX3:J; PX37 at 179:9–13; PX39

19  at 73:11–22.

20          [157] Doc. 84 at 15 ¶ 14.

21          [158] PX1 at ¶¶ 14, 41–44, 92, 158; PX1:B at 7, 9–10; PX1:DD; PX1:XX; PX41:A at 1–3,

22  24–40.

23          [159] PX1 at ¶¶ 92, 154–158; PX1:DD at 1–2; PX1:XX at 1–2.

23          [160] PX38 at 188:11–190:2.

24          [161] PX1 at ¶¶ 11, 42–43, 55; PX1:L at 1–3; PX1:M at 19, 21, 23, 43, 58; PX44 at 15:1–6;

25  PX80 at ¶ 7; PX80:K; PX80:L; PX80:R.

26          [162] PX1 at ¶ 43; PX1:L; PX2 at ¶¶ 16, 18, PX2:H at 9–11.

27          [163] *Cyberspace.Com LLC*, 453 F.3d at 1202 (quoting *F.T.C. v. Publishing Clearing House,*
    *Inc.*, 104 F.3d 1168, 1170–71 (9th Cir. 1997)).

28          [164] *Grant Connect*, 763 F.3d at 1102.

1   Sunyich Gardner, and Jared Mosher had the authority to control these Corporate Defendants.  The
2   FTC's admissible evidence on which this court relied in determining the undisputed facts above
3   clearly shows that these individuals had the authority to control them in this scheme and directly
4   participated in their common goal of charging unwitting victims and then attempting to convince
5   them not to have the charges reversed.  They therefore had full knowledge of Ideal's unlawful plan
6   and practices.  Each signed documents on behalf of these entities, directed customer-service
7   representatives how to respond to inquiries directed to these entities, opened and controlled bank
8   accounts for these entities, and thus had the full ability to control one or more of the Ideal family of
9   companies used to carry out this scheme to defraud victims.  And each was fully aware of the
10  massive rate of consumer complaints, chargebacks, return rates, and terminated merchant accounts.

11          The FTC has demonstrated that Steven exercised control over Ideal, which in turn
12  participated in the common enterprise by engaging in unfair billing practices and making deceptive
13  statements.  He had the ability to control Ideal and knew of the high chargeback rates.  Thus, Steven
14  Sunyich is individually liable for all the violations alleged in the FTC's complaint.

15          The same is true for Chris Sunyich.  As Ideal's President, Chris controlled Ideal's finances
16  and participated in numerous aspects of the scheme, including actually drafting call-center scripts
17  rife with false and misleading representations to consumers.  Chris received reports detailing the
18  unauthorized charges and discussed Ideal's return rates, complaint calls, and refund rates with Steven
19  and other managers and employees of the common-enterprise entities.  The FTC has established that
20  Chris exercised sufficient control over Ideal and its related entities and knew of the
21  misrepresentations being made.

22          The FTC has also demonstrated that Michael was Ideal's Vice President and Bracknell's
23  President.  Michael monitored call agents and was responsible for awarding bonuses based on agent
24  performances.  He knew the number of consumers who had requested funds, directed his call center
25  staff not to provide refunds, and spoke with Kent Brown regarding consumer complaints.  The FTC
26  has come forward with sufficient evidence to show that Michael (1) had the authority to control a
27  participant in the common enterprise, (2) knew of the unlawful activity, and (3) had the authority to
28  stop the activity but did not do so.

1    Similarly, the FTC has come forward with sufficient evidence to show that Melissa Sunyich

2  Gardner participated in the common enterprise and is individually liable for its violations.  Melissa

3  was an officer of Ascot, a scheme participant, for which she submitted numerous merchant

4  applications, signed corporate documents, and communicated with third parties on Ideal's behalf.

5  Although Melissa may have attempted to avoid questions about Ideal's business, she knew that

6  payment processors routinely terminated Ideal's merchant accounts and submitted corporate

7  paperwork even when it contained false information.  She also knew about consumer complaints and

8  high chargeback rates, because she discussed them with other individual defendants.  As an officer of

9  Ascot, she had the *de jure* authority to control Ascot's activities.  She remained wilfully blind to the

10  presence of the unfair and deceptive statements and trade practices at issue in this case.

11    Finally, Jared Mosher's individual liability has also been established.  The FTC has shown

12  that he was recruited to help run the common enterprise and directed Ideal's scheme along with

13  Steven and Chris Sunyich.  Mosher was President of Ascot, a participant of the scheme.  He

14  determined when Ideal would apply for merchant accounts, formulated Ideal's refund policy,

15  reviewed scripts, and told customer service agents what to say to complaining consumers.  Mosher

16  knew Ideal was charging consumers without authorization and that Ideal's merchant accounts were

17  being terminated for high chargeback rates.

18    With this evidence, the FTC has sustained its burden to show that the Corporate Defendants

19  committed the Section 5 violations alleged in the complaint and that Steven Sunyich, Chris Sunyich,

20  Michael Sunyich, Melissa Sunyich Gardner, and Jared Mosher are individually liable for these

21  violations.[165]  The burden thus shifts to the remaining defendants to show with citations to the

22  evidentiary record that there are genuine issues for trial.[166]

23  **B.    The Defendants Failed to Sustain their Summary-Judgment Burden.**

24    When the moving party meets its initial burden on a summary judgment motion, the "burden

25

26    [165] *See, e.g., F.T.C. v. MacGregor*, 360 Fed. App'x 891, 894–95 (9th Cir. 2009) (individual

27  awareness of complaints and refund rates demonstrates knowledge or reckless indifference); *accord, F.T.C. v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1082 (C.D. Cal. 2012).

28    [166] *Stefanchick*, 559 F.3d at 928.

then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."[167]  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[168]  It may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial."[169]  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[170]

Steven, Chris, Michael, and Melissa responded to the FTC's motion, but none did so with any admissible evidence.  Jared Mosher filed no response at all.  All of the responding defendants are adamant that the FTC has no evidence of their wrongdoing.  Steven and Chris claim that the FTC has failed to provide evidence of "ONE name of ONE consumer that filed a complaint against the Defendant or any Enterprise the Defendant was an officer or owner of."[171]  But the record is rife with this evidence because the FTC has offered depositions, declarations, and other admissible evidence showing that Ideal and the companies that formed the common enterprise and which the responding defendants directed and controlled were constantly the targets of consumer complaints.[172]  Russell Stevens's declaration particularly connects the dots.  A former Ideal call-center employee supervised by Steven, Michael, and Chris, Stevens declares that he fielded 50-60 calls each day using scripts and instructions provided by Michael.[173]  Though he was hired by Ideal, he was paid by Bracknell Shore, and his job was to tell "each caller about the additional products and programs

---

[167] *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).

[168] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

[169] *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

[170] *California v. Campbell*, 319 F.3d 1161, 1166 (9th Cir. 2003); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

[171] Docs. 180 at 2; 183 at 2.

[172] *See, e.g.,* PX7; PX8.

[173] PX8.

provided by Ideal Financial (although [he] never mentioned the company name)."[174]  He was

instructed to claim he was an employee of any one of the various Ideal companies depending on the

product that the caller was calling to complain about:

> At times, I answered the telephone and told the caller that I was an
> agent of Membership Care.  Other times . . . a screen on the telephone
> at my desk indicated what product the consumer was calling about. . . .
> When the telephone indicated that a consumer was calling about Debt
> 2 Wealth, I answered as an employee of Debt 2 Wealth, and the same
> for other products, such as Easy Loan Protection or Payday Loan
> Protection.[175]

He also "told each caller about the additional products and programs provided by Ideal Financial

(although [he] never mentioned the company name), including a membership called Ideal Goodness .

. . ."[176]  Stevens declares that, although he took 50-60 calls a day by the end of his time at the

company, "no callers with whom [he] spoke believed that they had authorized the charges that they

called about."[177]  The FTC has provided declarations from consumers who claim to have been

wrongfully billed for "Membership Care,"[178] EZ Loan Protection,[179] and Debt 2 Wealth[180] charges.

None of the responding defendants rebuts Stevens's sworn statements.  In sum, no defendant has

satisfied his or her burden to demonstrate the existence of a genuine issue of fact for trial.  The FTC

is therefore entitled to summary judgment on the remaining defendants' liability for the FTC Act

violations alleged in its complaint.

**C.    No Summary Judgment on Requested Relief**

The FTC has not, however, demonstrated its entitlement to summary judgment on the relief it

seeks.  The FTC asserts that, according to the business records of the common enterprise, the total

---

[174] *Id.* at 4.

[175] *Id.* at 2.

[176] *Id.* at 4.

[177] *Id.* at 2.

[178] *See* PX12; PX17; PX22.

[179] *See* PX26.

[180] *See* PX13; PX14; PX26.

1   sum unlawfully extracted from consumers through the defendants' scheme exceeded $43 million.[181]

2   The FTC requests I "convert the Receiver into a liquidating receiver and order it to wind down Ideal,

3   liquidate its assets, and pay net assets to the FTC for partial satisfaction for the redress owed to

4   Ideal's victims." *Id.* In calculating these damages, the FTC relies heavily on the work of expert Lisa

5   T. Wilhelm, whose opinions are summarized in her "Updated Expert Report" attached to the FTC's

6   motion.[182] But as explained *supra* at page 5, Wilhelm's opinions are not sworn under penalty of

7   perjury. I therefore decline to consider them. So, although I find that the FTC has sustained its

8   burden to demonstrate the remaining defendants' liability for the FTC Act violations it alleges, the

9   amount of their monetary liability has not been sufficiently established.

10          For this reason, I also decline to grant permanent equitable relief based on the FTC's

11   summary-judgment submission. The Act authorizes a permanent injunction when a defendant

12   violates the Commission's laws and will likely continue to do so.[183] To assess the likelihood of

13   future similar violations, a court looks to (1) the deliberateness and seriousness of the present

14   violation and (2) the defendant's past record with the violation in question.[184] The court must look to

15   the "circumstances as a whole and not the presence or absence of any single factor"; "the more

16   egregious the facts with respect to a particular element, the less important it is that another negative

17   factor be present."[185]

18          The FTC's argument for a permanent injunction is heavily based on its assertion that the

19   defendants attempted to steal approximately $82 million dollars from 1.5 million consumers.[186]

20   While there is ample evidence of defendants' culpability for the other portions of the scheme—such

21   as defendants' opening of numerous shell entities, the high chargeback rates, and terminated

22   merchant accounts—the severity of these factors, and by extension the scope of the injunctive relief

---

[181] Doc. 170 at 70.

[182] PX34.

[183] *F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *F.T.C. v. Evans Products Co.*, 775 F.2d 1084, 1086–87 (9th Cir. 1985) (citing cases).

[184] *Sears, Roebuck and Co. v. F.T.C.*, 676 F.2d 385, 392 (9th Cir. 1982).

[185] *Id.*

[186] Doc. 170 at 67.

the FTC should be given, is inextricably linked to the amount of money actually accounted for in the scheme. Because I have excluded Wilhelm's report, I lack sufficient admissible evidence of the total magnitude of defendants' actions to fashion the appropriate remedy. Accordingly, I decline to enter summary judgment on this or any other element of relief.

### Conclusion

Accordingly, IT IS HEREBY ORDERED that the FTC's Motion for Summary Judgment **[Doc. 170] is GRANTED in part and DENIED in part** as follows:

1.  It is **GRANTED as to defendants Steven Sunyich, Chris Sunyich, Michael Sunyich, Melissa Sunyich Gardner, and Jared Mosher's liability** for the violations outlined in the FTC's Amended Complaint (Doc. 32);

2.  It is **DENIED AS MOOT as to Kent Brown and Shawn Sunyich (because consent judgments have already been entered against them) and as to the Corporate Defendants Ideal Financial Solutions, Inc., Ascot Crossing, LLC, Bracknell Shore, Ltd., Chandon Group, Inc., Fiscal Fitness, LLC, and Avanix, LLC, (because the clerk has entered defaults against them, establishing their liability)**. Any judgment against the now-defaulted Corporate Defendants should be sought under Rule 55;

3.  It is **DENIED as to the FTC's request for remedies.** Should the FTC believe it has sufficient admissible evidence that it can properly present to support the entry of summary judgment on the remedies it seeks, it has 30 days to file a motion for summary judgment on these remaining aspects of its claims.

DATED June 29, 2015

Jennifer A. Dorsey
United States District Judge